Argued November 12, 1936; affirmed January 26; rehearing denied
February 23, 1937

STATE *v.* WESTON ET AL.

(64 P. (2d) 536)

Department 1.

*Glenn R. Jack,* of Oregon City (Butler & Jack, of Oregon City, on the brief), for appellant.

*Joe Price,* Deputy District Attorney, of Portland (James R. Bain, District Attorney, of Portland, on the brief), for the State.

ROSSMAN, J. This appeal presents two assignments of error. The bill of exceptions is accompanied with only a partial transcript of the evidence. The following, gleaned from the fractional record, will assist in an understanding of the disposition which we are about to make of the defendant's contentions. The indictment charges this defendant and his coindictee, George Leonard Fiedler, who was tried separately, with the crime of murder in the first degree committed by shooting Ernest C. Loll with a shotgun.

The defendant Weston, to whom we shall hereafter refer as the defendant, testified that September 29, 1935, at about 6:00 a. m., he and Fiedler left the city in Fiedler's car to hunt pheasants. The season for hunting pheasants was not open, and the defendant possessed no hunting license. Shortly their course led them along a highway near Portland known as the Stephenson road. Each carried a shotgun. In the rumble seat of their car was a revolver. As they drove along the Stephenson road some pheasants were seen, the car was stopped and the two men walked into the brush in opposite directions. The roadbed was much higher than the adjacent land and, hence, after the two had separated they could not see each other. The defendant shot a pheasant and took it into his possession. About this time he observed a car which was approaching upon the road. He now threw his pheasant away and hid himself. When the approaching car got near Fiedler's car he heard it stop, its door open and the footsteps of someone walking in gravel. Next, he heard a voice near the road declare ''The jig's up'', and then heard two shots fired closely together. Upon this development the defendant left his place of hiding and walked to the road. There he saw lying on the roadway a man dressed

in the uniform of a deputy sheriff and displaying an officer's star. This individual was Ernest C. Loll, the person described in the indictment, and who had been driving the approaching car. The defendant asked Loll whether he could help him, but received no response. The officer, according to the defendant, "seemed to be looking at me" and "there was just a gurgling sound down in his throat", but otherwise there was no sign of life. Blood was about the officer's mouth and shot wounds were visible all over his face. The defendant observed no blood coming through the officer's uniform, but described it as "spotted up". At this moment Fiedler walked over to the officer and kicked his gun away from him. Then, after Fiedler had ordered the defendant to start the car, he ordered him to turn his gun upon the officer and shoot. The latter was still lying prostrate upon the roadway 15 feet or less from where the defendant was seated in the car. The defendant took his shotgun and, without protest, fired it, stating, in explanation of his act, "There was nothing else that I could do. * * * I knew that he (Fiedler) would have shot me just as quick as he would the man on the ground". He swore that "what I tried to do was shoot into the dirt this side of the officer so as not to let him (Fiedler) see after the shots had passed over the body that I had missed him". Immediately thereafter Fiedler got into the car in which the defendant was already seated and they drove away, selecting a route which shortly returned them to Fiedler's home in Portland. A moment or two after the men had left the scene of the crime they met a car proceeding in the opposite direction. On their way home Fiedler stopped his car at a lonely spot and the defendant hid their shotguns, their re-

volver, and the gun which they had taken from the officer. Promptly upon reaching their home the two men altered the appearance of Fiedler's car. They obliterated a bright red stripe around its body, removed the hub caps, bumper, horn, tire cover and the top. These parts were then hidden. Next, the tires were removed and others were substituted. The defendant assumed the initiative in much of this work. A day or two later the two men assumed false names and, acting upon the defendant's suggestion, went to Moclips, Washington, where they were subsequently arrested. In the meantime, the defendant had decided to surrender himself to the public authorities, but had not done so. All of the above is based upon the testimony of the defendant.

In a preceding paragraph we mentioned the fact that Fiedler's car soon after leaving Loll met a car going in the opposite direction. That car was occupied by one George H. Carl and his wife. Shortly they saw a car on the road ahead and a figure lying in front of it. When they reached this place they stopped. Mrs. Carl, who was an employee of a Portland hospital, testified that Loll was lying "right on his stomach. The right side of his face was in the gravel. His left side turned up a bit.  *  *  *  He was breathing very deeply, a sort of rasping noise, and blood was coming from his nose and mouth". She observed shot wounds all over his face and hand. She swore that she experienced no difficulty in detecting the sound of his breathing, declaring that she heard it the moment she stepped out of her car. She testified: "You could hear it before you got to him." Her husband, referring to Loll, testified: "He was breathing very loudly.  *  *  *  I could stand two or three feet from him and hear him

breathing very easily. The blood was coming out of his mouth. He was making a rather gurgling, rasping noise as he breathed.'' The witness further testified that he put his hand on Loll's shoulder and spoke to him but obtained no response. After the two had taken in the situation Carl sought a telephone. Finding one, he telephoned for assistance and returned to Loll. In the meantime, Mrs. Carl had remained with Loll and had sought to help his breathing. While she was assisting Loll, Mrs. Margaret Maakestad, who was driving along the Stephenson road, came upon the scene and stopped. She swore: "I could feel him breathe, just a little bit. * * * He had a live color until he changed color all at once to a yellow color, but it seems to me it was about ten minutes, but then I wouldn't be sure." Mrs. Carl testified that the depth of Loll's breathing gradually diminished until at the end of about five minutes she could detect no further respiration and no pulse.

Based upon hypothetical questions, which were predicated upon the information given by the Carls and Mrs. Maakestad, Dr. Frank J. Menne and Dr. Warren C. Hunter, pathologist, who are members of the teaching staff of the University of Oregon Medical School, swore that in their opinions Loll was still alive when the Carls reached him. These two physicians performed an autopsy upon Loll's body. Dr. Menne testified that the cause of Loll's death was ''the multiple shotgun wounds of the face, chest and left arm and hand, with bleeding in the chest and the abdominal cavity; the bleeding, the combination of bleeding and shock from these wounds causing death''. He swore that two sizes of shot were found in Loll's body—those in his left arm and hand, in the tip of his left shoulder

and some in his face being larger than those in other parts of his body. He found approximately 300 shots in the officer's body, about 178 being in the left arm and hand. According to Dr. Menne, the shots broke both of the bones of the left arm and some of the bones of the left hand. He swore that the shots which entered the left arm and face hastened Loll's death, declaring: "I certainly would think that the broken bones in the forearm and the hand and the wounds in the face would contribute to hasten death by virtue of shock and the little loss,—or local loss of blood, whatever it might be, in addition to that already occurring in the chest and abdominal cavity." Upon cross-examination he testified that all of the wounds, together with the shock, hastened the death. Dr. Hunter testified that the result of the wounds in the left forearm, left hand and tip of the left shoulder was the hastening of Loll's death. Upon cross-examination he testified: "I regarded all of the wounds that we saw as being of importance in causing the death of Ernest Loll. I did not except any of those except those that merely entered the skin; all others, those that broke bones in the forearm and the hand, that entered the side of the face, that entered the shoulder, that entered the chest, each, all of them, I felt had a part in producing the death of Ernest Loll."

As we have already indicated, the shot that were recovered from Loll's left hand and arm and those taken from the tip of his left shoulder and some of those taken from the left side of his face were larger than the shot recovered from other parts of his body. Those taken from his arm, hand and shoulder were of the same size as the shot recovered by Dr. Menne from the pheasant which the defendant had shot. On this

appeal the defendant does not contend that the charge which he fired in the direction of Loll did not strike the officer.

One Joseph Beaman, who was an assistant to Dr. Menne, made four plaster casts of those portions of Loll's body wounded by the shots. One of these was a cast of his left forearm and hand. They were received as exhibits. These casts show the position of the wounds made by the three charges of shot. The cast of the left forearm and hand is a representation of the arm and hand beginning at a point somewhat below the elbow joint and extending to the first joint of the index finger. The thumb and other fingers are not included in the cast. The cast covers only the upper half of the arm and hand. These casts were made before the autopsy had been performed and were made under the direction of Dr. Menne. The witness described in detail the manner in which he performed his work and the method as outlined by him, apparently, would produce true likenesses. According to this witness, all of the shot wounds in the left forearm and hand were reproduced in the cast of those members. He swore that a peculiar disfigurement in the reproduction of the forearm indicates the dislocation which resulted from the breaking of the two bones of the forearm. He testified that in making casts small holes inevitably appear in the plaster due to air bubbles, and pointed out a number of them. Upon these casts are numerous small blue dots placed there by the witness to indicate the shot wounds and were intended to distinguish the latter from the air bubbles. He placed these marks upon the cast while he was comparing the latter with Loll's body lying in the morgue.

The defendant's first assignment of error is predicated upon a ruling of the court which received in

evidence as an exhibit the plaster cast of the left fore-arm and hand. He raises no contention concerning the propriety of the court in receiving in evidence the other three casts, although they are made of the same material and bear the same blue markings as the one under attack. The defendant's brief states his contention in the following words: "Unless exhibits or demonstrative evidence are necessary in some manner of substance or instructive to establish material facts or conditions, they are not admissible, especially when they are of such a character as to arouse sympathy or indignation or to divert the minds of the jury to improper or irrelevant considerations." In support of his contention, he cites *State v. Miller*, 43 Or. 325 (74 P. 658); *Newman v. State* (Tex. Crim. App.), 213 S. W. 651; *Peters v. Hockley*, 152 Or. 434 (53 P. (2d) 1059, 103 A. L. R. 1347); *Lampa v. Hakola*, 152 Or. 626 (55 P. (2d) 13). In *State v. Miller*, supra, the defendant had been indicted for a homicide and claimed that he shot in self-defense. The circuit court received in evidence, upon tender by the state, three photographs of the deceased showing the gunshot wounds. The state's purpose, according to the decision, was "to show thereby the number of shots discharged upon the person and that two of them took effect from the side or rear". According to the decision, these photographs "presented a gruesome spectacle of a disfigured and mangled corpse, very well calculated to arouse indignation with the jury". The photographer testified that the photographs "were as correct as any that could be taken under the circumstances, considering the condition of the light in the room". And a physician testified that "the photographs represented their true character as nearly as could be done by the process, but that they were not exact reproductions in that they failed to indicate the

oblique appearance of some of the wounds on the upper part of the chest". The decision, in holding that error was committed in the reception of these photographs, stated that they were unnecessary as proof of the number of shots fired or the direction from which they were discharged. It declared: "The pictures were not faithful reproductions" and "were manifestly harmful instrumentalities for use as evidence against the defendants without being useful in a legitimate sense for the state". The photographs were held inadmissible because (1) they were partially inaccurate; (2) other evidence had fully described the wounds; and (3) being gruesome, they were harmful to the defendants' cause without a corresponding gain to the state. In footnote 3 to § 1157, Wigmore on Evidence (2d) Dean Wigmore states concerning *State v. Miller*: "Photographs of gunshot wounds on the deceased, excluded as 'gruesome'; unsound on the facts." For further comment upon *State v. Miller,* see 15 Oregon Law Review, pages 254 and 266. In *State v. Eggleston,* 161 Wash. 486 (297 P. 162, 82 A. L. R. 1439), the court of our neighboring state to the north was so clearly satisfied that a photograph showing a gunshot wound upon the body of the deceased was admissible that it dismissed, without comment, the appellant's contention to the contrary. And see *State v. Casey,* 108 Or. 386 (213 P. 771, 217 P. 632), in which the decision held that enlarged photographs of wounds upon the deceased's body were admissible, stating: "It is now overwhelmingly established in this and other jurisdictions that a photograph, when verified by proof that it is a true representation of the subject, is admitted in evidence." That decision cited *State v. Clark,* 99 Or. 629 (196 P. 360), in which the decision held that the trial

judge did not err when he received in evidence a photograph showing the locality where decedent's body was found including the body itself.

In *Newman v. State,* supra, in which the accused was charged with murder, the trial court permitted a witness named Pruitt to display to the jury knife wounds inflicted upon him by the defendant in an encounter, during the course of which the deceased had met death. According to the decision, the wounds which the witness displayed "were severe and very uncomely in appearance. They are described and made to appear in the record as being of an ugly nature". The court stated: "There was no question raised by any of the testimony but what appellant did the cutting, and that he inflicted the nine knife wounds and those were on Pruitt's back." The decision held that "the exhibition of the scars on the naked person before the jury could serve no purpose and tended to solve no issue. * * * It is permissible to introduce this character of testimony only when its introduction serves to illustrate some point or solve some question, or serve to throw light upon the matter connected with the proper solution of the case, and under no other circumstances".

*Peters v. Hockley,* supra, and *Lampa v. Hakola,* supra, were civil actions. In the first of these two cases the ruling of the circuit court which was assigned as error permitted the plaintiff to demonstrate her inability, or pretended inability, to move her right shoulder without pain. The record showed that during the course of the demonstration she cried out with pain. In holding that the demonstration should not have been permitted, this court said:

"While the trial court may, in its discretion, permit a plaintiff in a personal injury case to exhibit a limb that has been injured, where there is no wound and no reason for inciting the sympathy of the jury, we think it was an abuse of discretion for the trial court to permit a demonstration or experiment of raising the plaintiff's arm and permitting the plaintiff to cry out in pain. The condition of plaintiff's arm and shoulder had all been testified to and both the plaintiff and Dr. McClure indicated that it would be painful for her to raise her arm, and counsel must have known that for the doctor to raise plaintiff's arm it would give her pain and it would naturally be expected that plaintiff would cry out or complain of the pain.

"Without suggesting that plaintiff was not acting in good faith, such a proceeding opens the door for simulation and has a tendency to arouse the sympathy of the jury for the plaintiff and possibly resentment against the defendant, and we think it was an abuse of discretion and error."

*Lampa v. Hakola,* supra, was also a personal injury action. The complaint averred an injury to the plaintiff's back. In the presence of the jury the plaintiff's physician was permitted to direct the plaintiff to bend forward and backward. The record indicated that during the demonstration the plaintiff protested his inability to comply with the directions and gave exclamations of pain. The trial resulted in a verdict for the plaintiff, which the circuit court set aside upon the defendant's motion for a new trial. The plaintiff then appealed. The order awarding the new trial was sustained by the decision of this court which cited *Peters v. Hockley,* supra.

It will be observed that the last three decisions throw but little light upon the problem now before us. In the first of these (*Newman v. State*) the nature and

depth of the wounds received by the third party were irrelevant. In the last two no injuries were visible, and the possibility of simulation was so great that error was committed when the demonstrations were permitted. As those two decisions indicate, the courts are cautious about permitting demonstrations, and author-ize them only when they will enlighten the jury without provoking undue sympathy or producing confusion.

In the present instance, the object received in evidence was not a photograph but a cast which, according to the proof, is of the exact size of the parts of the deceased's forearm and hand which received the shots fired by the defendant. The purpose for which it was offered was to enable three witnesses called by the state (Joe Beaman and Drs. Menne and Hunter) to give to the jury a better understanding of the effect produced by the shots. In Wigmore on Evidence (2d Ed.), § 790, a model is aptly described as "a superior substitute for words".

■ Casts which correctly represent the object concerning which relevant testimony is given and which may assist the jury in understanding the evidence are frequently received in evidence. *Mann v. State,* 22 Fla. 600 (murder; plaster casts of footprints received); *Gardner v. Paulson,* 117 Ill. App. 17 (personal injury action; a cast previously worn by plaintiff upon her injured limb received); *The People v. Searcey,* 121 Cal. 1 (53 P. 359, 41 L. R. A. 157), (murder; cast of a footprint in a box of sand received); *Earl v. Lefler,* 46 Hun. 9 (civil action for breach of warranty in the sale of a horse; cast of the horse's mouth received); *Johnson v. State,* 59 N. J. L. 535 (37 Atl. 949, 39 Atl. 646, 38 L. R. A. 373), (murder; prints made in a box of sand in the presence of the jury by boots formerly worn by prisoner

admitted). In *Kelley v. Spokane,* 83 Wash. 55 (145 P. 57), the court stated that the practice of admitting models in evidence "in all proper cases should be encouraged. Such evidence usually clarifies some issue and gives the jury and court a clearer comprehension of the physical facts than can be obtained from the testimony of witnesses".

The defendant's objection to the cast is three-fold: (1) recourse to it was unnecessary because, according to the defendant, the witnesses could correctly describe the wounds without assistance of the cast; (2) after the blue dots which indicate the wounds had been placed upon the cast it was no longer, so the defendant says, a true representation of deceased's forearm and hand; and (3) the cast was, according to the defendant, a gruesome object and, therefore, prejudicial to his interests.

■ In arguing in behalf of the first of these contentions, the defendant quotes excerpts from the testimony which he believes indicate that witness Joe Beaman could have correctly described to the jury the wounds and their places upon the left arm and hand without recourse to the cast. We have read all of the evidence which is before us, and do not believe that the defendant's construction of it is correct. Manifestly, whether the witness believed so or not, it would have been impossible for anyone to give as good a description of the 178 wounds upon the arm and hand without a cast, photograph or other object, as with one. In the absence of a cast he would, in all likelihood, have indicated the wounds by the use of his own arm or other object. In *Chicago & A. Ry. Co. v. Walker,* 217 Ill. 605 (75 N. E. 520), a witness, under somewhat similar circumstances, employed the skeleton of a foot and this,

the court held, was not error. As Dean Wigmore states in a citation which we have already given, the cast was "a superior substitute for words". Its use must have conveyed to the jury a better understanding of the evidence than mere words could have afforded.

█ The second objection is based upon the proposition that, with the blue indications of the wounds upon it, the cast was no longer a true representation of Loll's arm and hand. Of course, a plaster cast can not be a duplicate of one's arm. The latter is made of flesh and bone, impossible of duplication by man. The cast is of a different color from flesh. In many other ways this cast makes no pretense of being a duplicate of the flesh and bone of the deceased. Only one of the differences is the presence of the blue ink which Beaman fully explained. But after the defendant had inflicted the 178 wounds upon the deceased's arm and hand, blood and powder marks appeared. If it was necessary for the state to produce a duplicate of the wounded arm before it could be admissible in evidence, it would have been necessary for Beaman to have so colored the indications of the wounds as to indicate the presence of the blood and the powder burns. Manifestly, such markings could not have been tolerated because they would have been unnecessary and highly harmful to the defense. Hence, a duplicate was not the objective sought, but only a sufficient likeness that the cast would serve the intended purpose. Without the blue markings, as Beaman testified, one unfamiliar with casts would have experienced difficulty in locating the wound indications and might have been deceived by the air bubble holes. In our examination of the cast, we have noticed that some of the wounds, as represented upon the cast, are very shallow and, therefore, difficult

to discern. The jury was amply informed that the sole purpose of the blue dots was to indicate the presence of the wound. Since the jurors could rightfully look at the indications of the wounds, we can not understand how the help which these small dots gave them in locating the wounds could have prejudiced any interest properly claimed by the defendant.

In the decisions which we shall now review contentions similar to those made by the defendant were rejected. In *People v. Gomez*, 209 Cal. 296 (286 P. 998), the defendants, who had been convicted of murder, contended on appeal that the lower court erred when it received in evidence a photograph of the deceased which showed not only the wounds which they had inflicted, but also the marks of incisions made for the purpose of an autopsy. The defendants killed the deceased by fracturing his skull with hammer blows. In rejecting the defendants' contentions, the decision, referring to the photograph, states:

"It is contended that the abhorrence of the jurors was thereby prejudicially aroused. But the autopsy surgeon pointed out to the jury the marks resulting from his examination and it is not claimed that the exhibit otherwise did not correctly depict the condition of the deceased after the murder."

In *People v. Elmore*, 167 Cal. 205 (138 P. 989), the defendant, who had been convicted of murder committed by shooting his victim, on appeal, challenged a ruling of the trial judge which admitted in evidence two photographs of the deceased's neck. The decision, referring to the photograph, states:

"In one of these the cut appeared as it was sewed up prior to his death, in the other the stiches had been removed and the edges of the cut were held apart by

two short sticks inserted for the purpose, thus disclosing the incision of the windpipe made by the wound.''

In holding that the reception of the photographs was not error, the court stated:

''There is nothing to show that these photographs were offered for any other purpose than to show the size and extent of the wound. They were competent for that purpose under the circumstances and with the explanatory proof made.''

In *State v. Remington,* 50 Or. 99 (91 P. 473) the defendant, who had been convicted of the crime of assault with intent to kill, contended on appeal that error was committed in admitting in evidence a map of the place where the shooting had occurred. The engineer who prepared the map had marked upon it indications of many objects, some of which he had seen, but others were placed according to the statements of those who had employed him. He had printed near the markings legends of which the following are illustrations: ''Pig shed''; ''Log 3 feet high''; ''Point where shells were found''; ''Bullet hole in fence 3½ feet above ground.'' He also placed upon the map several lines and figures which represented the distance between the places which the witnesses would mention during the course of the trial. In holding that its reception did not constitute error, this court quoted from *Adams v. State,* 28 Fla. 511 (10 So. 102):

''We think a map or diagram of the country in its physical condition at the time can be put in evidence, and any witness, in giving testimony as to localities, can indicate on the map the relative position of things or persons.''

The decision then stated:

"In the case at bar A. E. Pender testified that the morning after the shooting he found in the grass and ferns at a point about six or eight inches west of the log indicated on the map, and at the southwest corner of the shed, two '30-30' shells, and two days thereafter he discovered another shell of the same size about three feet southwest of where he found the others; and, his attention having been called to the map, he identified thereon the places and objects thus indicated. Referring to a bullet hole in a picket of the fence, he further stated that the perforation in the paling was in a direct line between the places where the two shells were found and where the plow was left in the furrow."

In *Mansfield v. Southern Oregon Stages,* 136 Or. 669 (1 P. (2d) 591), which was a personal injury action, a map was received in evidence which had been prepared by a engineer and which, besides showing the highway involved in the accident, bore two marks, opposite to which were legends: "First point of contact at the station 107 x 85.0", and "Second point of contact 25 feet west of first point." The engineer was not present when the collision occurred, and placed the marks obedient to the plaintiff's instruction. Our decision stated:

"We do not approve the introduction in evidence of the legend upon the map in question, but we fail to find that it is reversible error. A map or photograph introduced in evidence must be verified by some witness. The map in general was properly verified by the engineer who drew it as being a fair representation of a portion of the Ashland-Klamath Falls Highway. The additional marks or legends shown on a map, but not verified in particular, 'must similarly be sponsored,' says Mr. Wigmore in 2 Wigmore on Evidence, § 794."

In *Wade v. Southern Railway,* 89 S. C. 280 (71 S. E. 859), the court held that no error was committed by the introduction in evidence of a photograph of the scene of an accident upon which was written, "Looking toward Cayce, 75 yards from river trestle", because the information conveyed by the legend had been verified by the witnesses.

■ From the above authorities we deduce the rule that maps, photographs, et cetera, containing markings, are not inadmissible if they are otherwise relevant and if the individual who made the mark or wrote the legend was familiar with the facts and so testifies, or if some other witness, familiar with the facts, adopts the mark or legend as his own.

In the present instance, Beaman had checked his cast with the shot-riddled arm as the body of the officer lay in the morgue. Wherever he found that a wound appeared on Loll's arm he placed a blue mark upon the corresponding indentation in the cast. Clearly, the bloody wounds upon Loll's arm and hand could be recognized much more easily than the indentations of the wounds upon the cast. The actual wounds were colored with blood, but their corresponding indications in the cast were of exactly the same color as the rest of the surface. The defendant does not contend that Beaman made a single mistake. He does not contend that Beaman placed a dot where no wound indication was present, nor that his work was inaccurate in any degree. This contention, in our belief, lacks merit.

Defendant's third contention submits that the cast was a gruesome object, prejudicial to him, and that it was therefore inadmissible. The rule that pertains to

the problem of prejudice arising from the exhibition to the jury of wounds, et cetera, is thus stated in § 1157, Wigmore on Evidence (2d Ed.):

"The autoptic preference to the jury of the weapons or tools of a crime, or of the clothing or the mutilated members of the victim of the crime, has often been objected to on grounds of Undue Prejudice. * * * The objection thus indicated seems to be twofold. First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence. * * *

"The objection in its second phase cannot be entirely overcome, even by express instructions from the Court; but it is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice. No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial court has a discretion to prevent the abuse of the process. But, in the vast majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the courts."

In murder cases objects much more prejudicial to the defendant than a plaster cast have frequently been held admissible in evidence. In *Savary v. State,* 62 Neb. 166 (87 N. W. 34), the court held that the skull of the deceased and a photograph thereof were properly admitted. It referred to the fact that the medical witnesses for the state employed these objects in giving their testimony, and held they were "entirely competent in establishing a material element in the state's

case, viz, that the blow delivered by the defendant to the deceased was the direct and proximate cause of his death." In *State v. Mariano*, 37 R. I. 168 (91 Atl. 21), the defendant challenged, on appeal, the ruling of the lower court which received in evidence portions of the skull of the deceased with some other fragments of bone. The decision stated:

"In this case the manner of the killing was a matter of inference. The fractured bones served to demonstrate the destructive force and effect of the blows inflicted better than a technical, verbal description and gave the jury opportunity as practical men to judge for themselves whether the injuries were likely to follow from a stone or similar weapon as described by the medical witnesses."

In *State v. Wieners*, 66 Mo. 13, the defendant claimed that error was committed in receiving as exhibits the bones of the vertebral column of the deceased. In rejecting this contention, the decision stated:

"It served to show to the jury the attitudes and relative positions of the parties when the shot was fired. It was not an unnecessary parade of the bones of the dead man to excite prejudice against his slayer, but was legitimate and proper evidence, and a party cannot, upon the ground that it may harrow up feelings of indignation against him in the breasts of the jury, have competent evidence excluded from their consideration."

In § 3603 Chamberlayne on Evidence the author reviews many decisions which hold that the skull, bones, etc., of the deceased, when relevant to the issue developed upon the trial are not rendered inadmissable because of a tendency to prejudice the jury against the defendant. He adds that care "should be exercised by the presiding judge that the submission is not made

under such circumstances as to have this effect". We note that in *Lund v. Olson,* 182 Minn. 204 (234 N. W. 310, 75 A. L. R. 371), which was a personal injury case, the court held that no error was committed in receiving in evidence a bottle containing four ounces of brain matter and eight pieces of splintered bone taken from the head of the plaintiff.

In murder cases photographs showing the wounds upon the body of the deceased have frequently been held admissible even though the pictures were repulsive and would therefore adversely affect the interests of the defendant. In *State v. Casey,* 108 Or. 386 (213 P. 771, 217 P. 632), enlarged photographs of the deceased's wounds were held admissible. In *State v. Gaines,* 144 Wash. 446 (258 P. 508), the court sustained the admissibility of a portion of the skull of the deceased and the photograph of the head of the deceased showing injury. In *Commonwealth v. Retkovitz,* 222 Mass. 245 (110 N. E. 293), the court declared:

"The photographs of the neck and face of the dead woman, Donka Perenebida, for the murder of whom the defendant was on trial, rightly were admitted in evidence. * * * Natural abhorrence of a crime such as that charged in the indictment was an inevitable incident of the trial. Competent and material evidence is not to be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible."

In *State v. Miller,* 52 R. I. 440 (161 Atl. 222), the court sustained the admissibility of photographs which showed not only the bullet wounds on the body of the deceased, but also his entire body. We quote from the decision:

"It was argued that the photographs would cause a feeling of repulsion and would prejudice the minds of

the jury against the defendant. It is not contended that the photographs were not genuine and correct. They were competent to prove the nature of the wounds, the identity and cause of death of the deceased.''

In *State v. Burrell*, 112 N. J. L. 330 (170 Atl. 843), the court held that no error was committed in the reception of two photographs of the body of the decedent which were offered to show marks and bruises on her throat, in support of the state's theory that the woman had been choked to death by a man's hand. We quote from the decision:

''The argument against the admission of the photographs is that they served 'to prejudice the minds of the jury against the defendant.' That contention, if true in point of fact, is ill founded in point of law. * * * Assuming that they tended to prejudice the minds of the jury, that does not render their admission illegal. They tended to prove a material fact, without which the State would be unable to support the charge laid in the indictment.''

In *Commonwealth v. Winter*, 289 Pa. 284 (137 Atl. 261), the accused, who had been convicted of the murder of two children, challenged the admissibility of photographs of the deceased children which were taken at a morgue. The decision stated that if the purpose of offering them was to excite prejudice against the accused, they were inadmissible, but

''We find on examining the record that they were used by the doctor who performed the autopsies on the children to explain the location and severity of the wounds.''

It held:

''That they may militate against the accused is no ground for rejecting them if their use is in aid of the

jury's investigation of the crime. Wigmore on Evidence (2d), Vol. 2, § 792. The admission of photographs and the use to be made of them on the trial must necessarily rest largely in the discretion of the trial judge who can determine whether they serve a proper purpose in the jury's enlightenment.''

In *Commonwealth v. Sydlosky,* 305 Pa. 406 (158 Atl. 154), the court sustained the admissibility of the photograph of a baby whose hands and feet had been cut off. The defendant was accused of its murder. In sustaining the admissibility of the photograph, the court cited *Commonwealth v. Winter,* supra, and reiterated the principles therein announced.

██ In the present instance, it was necessary for the State to prove that the shot which the defendant fired struck Loll and hastened his death. It may be that Loll was mortally wounded by Feidler; nevertheless, the defendant was guilty of the crime charged in the indictment if the effects of his shot hastened Loll's death. Wharton's Criminal Law (12th Ed.), § 433; 13 R. C. L., Homicide, p. 748, § 53; 29 C. J., Homicide, p. 1077, § 54; and *State v. Francis,* 152 S. C. 17 (149 S. E. 348, 70 A. L. R. 1133). In giving testimony which showed the effect upon Loll of the shots fired into his arm and hand by the defendant, and which indicated that Loll's death was thereby hastened, the State's witnesses used this cast showing by it where the shots entered and how blood was lost. In the same manner they showed how the shots were largely concentrated in two groups, one of which broke the two bones of the forearm and the other the bones of the hand. The cast illustrated this testimony and must have given the jury a much better understanding of the effects of the shots than mere words could possibly have conveyed. We are clearly satisfied that the cast was offered

for a permissible purpose and not for the purpose of prejudice. The cast, in our opinion, while not pleasing to the eye, possesses little of a gruesome nature and is no more obnoxious than would be any model, cast or photograph showing the results of a brutal act. Since the cast could very effectively help the jury in arriving at a correct understanding of the facts, they were not to be denied this help because the cast's appearance was not agreeable. Defendant's first assignment of error possesses no merit.

The second, and last, assignment of error is thus expressed in the defendant's brief: "The court instructed the jury, among other things, that Ernest C. Loll, deceased, was a peace officer and gave the definition of a peace officer with the admonition that said peace officer at said time was permitted to carry firearms (Tr. 131) and in addition thereto, instructed said jury that on the 29th day of September, 1935, it was unlawful to hunt China pheasants, and if the jury found that the defendant was hunting China pheasants on said day that he was doing an unlawful act." Defendant argues that the instructions mentioned in this assignment of error were abstract and that, hence, reversible error is indicated. All of the facts mentioned in the above assignment had been developed during the course of the trial without exception. The court merely added that a peace officer was permitted to carry firearms and that the hunting of pheasants in the prohibited period was unlawful. Undoubtedly, the jury must have known that a peace officer could lawfully carry firearms, and also must have known that the hunting of game during the closed season was unlawful. The court's mention of the above items was incidental to its instructions upon material matters. After having

mentioned the fact that the shooting of pheasants on September 29, 1935, was in violation of law, the court added: "This, however, was not a felony. * * * Whether the season for hunting these China pheasants was open and whether or not it was lawful or unlawful, is unimportant in this case, because the defendant was not committing a felony, even though it was unlawful at the time and at the place to hunt China pheasants." When defendant's counsel sought an exception to the portion of the charge which stated that Loll was a peace officer "because it is an abstract proposition of law", the trial judge added to his instructions by stating: "I would say, with reference to that matter, that it is relatively unimportant. It is, however, somewhat explanatory in view of the fact that the man who was killed at this time was an officer." Then defendant's counsel referred to the portion of the instruction which stated that it was unlawful to shoot pheasants on September 29th, and sought an exception. At this point the trial judge declared: "I think that is also relatively unimportant matter as far as the State's case is concerned; it is, however, possibly somewhat explanatory to the jury of the general background of the case."

■■ An abstract instruction is deemed erroneous because it may cause the jury to assume that evidence has been given of the kind to which the instruction is applicable. Thus, such an instruction may be misleading, but the giving of such instruction is cause for reversal only when it is reasonably apparent that the jury has been misled. In the present instance, the record is replete with evidence that Loll was a deputy sheriff and that he was equipped with two firearms. The defendant admitted that it was unlawful to hunt pheasants on September 29th. It will be recalled that upon hearing a car

approaching he hid the pheasant which he had just shot. Had the presiding judge not informed the jury that the shooting of pheasants during the closed season was not a felony, some juror might have been misled by the absence of information upon this subject. The instructions were merely explanatory of facts revealed by the testimony, especially after having been augmented by the additions made during the course of the defendant's exceptions. We are clearly satisfied that nothing developed by this assignment of error presents cause for reversal.

■ The fractional record which is before us indicates that substantial evidence proved the defendant's guilt of the crime charged in the indictment. Having found no merit in the two assignments of error, it follows that the judgment of the circuit court must be affirmed.

BEAN, C. J., and BAILEY and KELLY, JJ., concur.