Argued September 26, reversed December 24, 1957, petition for
rehearing denied February 11, 1958

# LAYNE *v.* PORTLAND TRACTION COMPANY

319 P. 2d 884
321 P. 2d 312

*Lamar Tooze* and *Lamar Tooze, Jr.*, Portland, argued the cause for appellant. On the briefs were Phillips, Coughlin, Buell & Phillips, Portland.

*Bert E. Joachims,* Portland, argued the cause for respondent. With him on the brief was Harry G. Spencer, Portland.

Before PERRY, Chief Justice, and ROSSMAN, LUSK and WARNER, Justices.

ROSSMAN, J.

This appeal by the defendant, Portland Traction Company, challenges a judgment which the circuit court entered in favor of the plaintiff in an action brought by him to recover damages for personal injuries which he suffered November 19, 1953 at 6:04 p. m., when a west-bound freight train of the defendant, in crossing Southeast 92nd avenue in Portland, collided with the pickup truck which he was driving northerly at that point. The complaint alleges that the cause of the collision was negligence upon the defendant's part. The entry of the challenged judgment

was preceded by the return of a verdict in the plaintiff's favor in the sum of $10,000. The defendant-appellant presents nine assignments of error.

The course of 92nd avenue is north and south. The defendant's track does not cross 92nd avenue at a right angle but pursues a direction which is southwest and northeast. The defendant's train, as it approached Southeast 92nd avenue, came from the northeast and was therefore to the plaintiff's right as he approached the crossing from the south.

The defendant's track is straight for a considerable distance on both sides of Southeast 92nd avenue. At the time of the collision (nighttime) the sky was overcast and the weather was rainy. The air was free of fog. The plaintiff was familiar with the crossing. As he neared it he was aware of the fact that the rails were there and that trains, both passenger and freight, passed over them from time to time. He conceded that he saw at that time two signs which warned the motorist of the railroad crossing. There was a conflict in the evidence as to whether brush, which grows on or near the south side of the defendant's right of way, partially obstructs the view of those who approach the crossing from the south, as plaintiff was doing.

The complaint charged that the defendant operated its train at an excessive rate of speed, without exercising due control and without displaying a light. It also alleged that the defendant failed to maintain a lookout and give a warning signal. The answer, in addition to denying the complaint's charges, averred that the plaintiff was guilty of contributory negligence in failing to yield to the train the right of way, and made accusations against him respecting listening, lookout, stopping and control.

■ The evidence indicates that the area in the vicin-

ity of the above-mentioned grade crossing is somewhat rural in nature. Photographs of the crossing disclose adjacent open fields. In the southwest corner near the track a small shelter for the convenience of the defendant's passengers has been placed. South of the shelter are two dwelling houses. The second is 200 feet or so from the tracks. The three structures offered no interference to the view of the motorist, who approached the crossing from the south and looked to the east for the purpose of determining whether or not a train was in sight. The other three corners of the crossing contained no structures.

The first assignment of error follows:

"The Court erred in denying defendant's motion to withdraw from the consideration of the jury plaintiff's claim that the defendant failed to have or keep a proper or any lookout for vehicles traveling on and along S. E. 92nd Avenue and in particular for plaintiff's vehicle, which motion was as follows:

" 'MR. BUELL: Since we did not request in our instructions we would specifically ask the Court to withdraw from the consideration of the jury the ground of negligence of failing to keep the train under proper control and of the failure to keep a proper or any lookout for the reason that there is no evidence to support either of such claims.

" 'THE COURT: Well, the motion is denied, and you have an exception in each instance.' "

We shall now take notice of the evidence which pertains to that assignment of error.

The plaintiff presented no direct evidence indicating that the members of the defendant's train crew did not see his vehicle as it drew near the railroad crossing and, therefore, when he rested, the presumption that the defendant had exercised due care in the

maintenance of a lookout remained unimpaired so far as the plaintiff's direct evidence upon the subject bore. We will presently quote the part of plaintiff's (respondent's) brief which presents the principal argument that defendant did not maintain an adequate lookout, but before doing so will identify the individuals whose names appear in the quoted passage. William H. Green was the defendant's fireman and as such spent more time in the right half of the engine's cab. Albert Masloskie was the engineer in charge of the defendant's locomotive and, as the train approached the crossing, was seated in the left part of the cab facing the plaintiff. Nuel Hood lived in the immediate vicinity of the crossing and was driving home when the collision occurred. At the fateful moment, he was proceeding south [opposite plaintiff's direction] and saw the plaintiff's headlights. He swore that he also saw the train's headlight and heard its whistle. Arthur K. Johnston, a witness for the plaintiff, was also proceeding home at the time of the collision. He was driving in the same direction as Hood and within a few feet of him.

The following is the part of plaintiff's brief to which we referred:

"At the time of the accident, fireman Green testified he was looking to the right (Tr. 489). Mr. Green further testified that it was the engineer's duty to concentrate on the left side and that prior to the collision, Masloskie was sitting with his head out the left or south side of the cab (Tr. 478, 489).

"The engineer, in his deposition, testified he first observed the plaintiff's vehicle some 550 feet away from the crossing and at the moment the train was about 200 feet from the grade (Tr. 523, 524). It was only when the train reached a point 25 feet from the crossing that the engineer was aware a collision was likely to occur (Tr. 524).

"Defendant's witness, Nuel Hood, who was north of the crossing, however, was aware that a collision was going to occur when the train was 400 feet from the crossing and plaintiff's vehicle some 200 feet from the crossing (Tr. 414, 417). On cross examination the same witness testified that a collision was imminent when he was 100 feet north of the crossing (Tr. 430). While there is considerable conflict as to what Mr. Hood did see by reason of his position at the time of the accident, it is elementary that the jury could believe all or any part of the testimony produced by the two witnesses, Masloskie and Hood *Kirby v. Southern Pacific*, 108 Or. 290.

"Based upon the testimony of these two witnesses it is readily apparent that the jury could find Masloskie should have discovered a collision was likely, as did Nuel Hood, before the train reached a point a mere 25 feet from the crossing. Mr. Hood, who obviously could not observe plaintiff's approach as well as the engineer, discovered the peril before Masloskie.

"Witness Johnston testified he saw the train when it was about 100 feet from the crossing and when his southbound vehicle was some 60 feet north of the intersection (Tr. 307, 308, 309). Johnston further stated that he stopped momentarily before the collision and that the stop was made about a car length from the crossing (Tr. 328, 329, 340). It should be pointed out that prior to the collision, the engineer, Albert Masloskie, observed a car stop immediately north of the tracks (Tr. 523, 524). The testimony of the engineer then establishes that he observed the Johnston vehicle when it stopped (Tr. 421). His testimony further establishes that the engineer obviously was looking to his right rather than to the left when he operated the train within the last 100 feet from the crossing. It is clear the jury could find that Masloskie did not concentrate on looking to his left and thus discharge his duty as he should have. Mr. Green described that duty (Tr. 489)."

The above is the essence of the plaintiff's contention that the defendant's train crew did not maintain an adequate lookout and that, therefore, the assignment of error under consideration lacks merit.

The crew that operated the train consisted of a conductor, an engineer, a fireman and a brakeman. The conductor had left the train a few minutes prior to the collision so as to arrange, according to the defendant's routine, for the passage of a passenger train which was running in the opposite direction. Therefore, he could give no testimony upon the subject matter of the above assignment of error.

William H. Green, the aforementioned fireman, testified that he was in the right half of the engine's cab as the train approached 92nd avenue. He explained that the feature of his duties which pertained to the maintenance of a lookout required him to look primarily to his right, that is, to the north (the plaintiff was approaching from the south). Green testified that he, however, gave some attention to the traffic to his left. He declared that when the plaintiff's pickup truck was "probably 500 or 600 feet" from the track he observed it. The train was then traveling, so he estimated 25 miles per hour. According to him, the engine's headlights were burning and the engineer started the crossing signal when the train drew within 500 feet of 92nd avenue. Green swore that at about that time he saw two automobiles approaching the intersection from the north that were 400 or 450 feet from the track. Those cars, according to him, slowed down and stopped before they came to the rails so as to enable the train to proceed on its way. Green testified that when the train was about 50 feet from the crossing he foresaw "there was an impending accident" and at that moment the engineer blew a succession of short blasts

with his whistle and "immediately throwed the train into emergency position." The train stopped in slightly less than its length.

Giles Palmer, the train's brakeman, was in the caboose as the train approached 92nd avenue and, apart from testifying that the headlight was burning and that he heard the whistle signal for the 92nd avenue crossing, gave no testimony that pertained to the assignment of error under consideration.

Albert J. Masloskie, the engineer of the train, died prior to the trial, but his deposition had been taken after the accident and was read at the trial. Masloskie swore that he saw the plaintiff's car when the engine was 550 feet from the crossing. He thought that the train's speed at that time was 15 to 20 miles per hour. About the same time he noticed the headlights of two cars that were coming from the north toward the crossing. The witness explained that the defendant's whistle posts are 500 feet from the intersections and that he began the crossing whistle for 92nd avenue when he was 500 feet from that point. He described the crossing signal as "a long, two shorts and a long." According to him, the whistle continued to blow, apart from the three brief interruptions, until the train reached the intersection. When the engine was about 200 feet from the crossing, according to Masloskie, he noticed that the cars that were approaching from the north had come to a stop so that the train could proceed on its way. He swore that he did not realize that the plaintiff's car would not stop until the engine was about 25 feet from 92nd avenue. At that moment he made an emergency application of the brakes and sanded the rails. He was positive that his headlight was burning and that the cab lights were likewise illuminated.

■ Such was the testimony given by the members of

the crew upon the charge that the defendant failed to employ a lookout. We see from it that both the engineer and the fireman swore that they saw the plaintiff's vehicle when it was 500 to 600 feet from the rails. The engine was then, according to those two witnesses, 500 feet from 92nd avenue. About the same time they saw two cars approach the intersection from the north and come to a stop when the train neared the street. The engineer, as we have seen, swore that he kept his mind on the plaintiff's car and did not realize that it would not stop until it had approached to about 25 feet of the track. We shall presently see from the plaintiff's testimony that he reduced his speed as he neared the track. The fact that Masloskie saw the two cars which approached the crossing from the north does not indicate that his lookout was lacking in diligence.

The plaintiff testified that, although he looked and listened as he drew near the crossing, he neither saw nor heard a train. According to him, his speed was 25 miles per hour as he approached the crossing and was reduced to about 15 as he neared the track. He did not stop before attempting to drive onto the rails. He swore that he saw no lights on the engine and heard no whistle. We take the following from his testimony:

"Q The accident occurred and you never did at any time see the train; is that correct?
"A That is true. I never did see the train.

"Q And you never heard any whistle?
"A No whistles.

"Q Not even from a distance?
"A No, sir, I did not."

Following the accident, he told a police officer, ac-

cording to the latter's unchallenged testimony, that "he didn't even know what he hit."

The evidence as to the train's speed varied from a high of 55 miles per hour to a low of 20 miles.

Two witnesses (Hood and Johnston aforementioned), who were approaching the crossing from the north in motor vehicles simultaneously with the plaintiff's approach from the south, testified that they observed the illuminated headlight of the locomotive. We believe that an inference is warranted that the headlights of those two motorists were of the cars which the train crew saw as the train approached the crossing.

The foregoing shows that both the engineer and the fireman testified that they saw the plaintiff's vehicle when it was about 500 feet south of the track. The plaintiff testified:

"Q In any event, as you approached the crossing that night, you had a clear view to see any train or interurban car that was approaching from the time that it got to about the fourth power pole east of 92nd Avenue all the way into the crossing itself when your car got to the south side of that house that—on the west side of 92nd; isn't that correct?

"A Well, if that train was properly lighted I probably could have seen it, yes.

"Q That's right.

"A I would think I could anyway, although the picture speaks for itself. There is brush and foliage all along there, up and down both sides."

The question above quoted spoke of the "fourth power pole east of 92nd;" the unchallenged testimony indicates that the power poles are 100 feet apart. Therefore, the question referred to a point 400 feet east of 92nd avenue. The question also in-

cluded these words, "when your car got to the south side of that house." "That house" to which the question referred was, according to the plaintiff, 150 to 200 feet from the track. We see from those facts that the plaintiff conceded that as the train ran westerly it came into view when it reached a point 400 feet east of 92nd avenue to a person in 92nd avenue who was 150 to 200 feet south of the track. It will be noticed that after the plaintiff had first conditioned his acquiescence in the question by saying, "If that train was properly lighted," he shortly added, "I would think I could anyway, although the picture speaks for itself." The "picture" was one of many photographs of the grade crossing and its immediate vicinity which the parties introduced as exhibits. One of them was taken from a point 400 feet east of 92nd avenue with the camera pointed to "that house." In front of "that house" there stood at that time the automobile of the photographer. The photograph shows that the car was plainly observable from the place where the photographer stood. Accordingly, when a car was in front of "that house" its driver could see a train coming from the east that had reached a point 400 feet east of 92nd avenue.

Since a motorist, upon reaching a point in 92nd avenue in front of "that house" could see the train when it was 400 feet east of 92nd avenue, it would seem reasonable to infer that the train crew could see the plaintiff's automobile in the manner in which they claim they saw it, unless some incident which we have not so far mentioned requires a different conclusion. We have read the testimony with care and have discovered none. To the contrary, the record shows that the members of the defendant's engine crew, in occupying their positions in the cab of the engine, were

materially higher above the ground than a motorist who is seated behind his steering wheel. They, therefore, occupied a superior vantage position. We add that the record also shows that the Diesel engine which participated in the collision is a tall object which should have been more readily discernible than an automobile.

It is seen from the foregoing that the testimony given by the engineer and the fireman that they saw the plaintiff's car when it was 500 feet or more from the track was not contradicted.

By reverting to the excerpt which we took from the plaintiff's brief, it will be noticed that the plaintiff seeks to sustain his charge that the defendant's train crew failed to maintain an adequate lookout by calling attention to Hood's testimony in which that witness spoke of his fears that the train and the plaintiff's car would collide. The part of Hood's testimony upon which the plaintiff particularly relies follows:

"Well, as I was traveling south I was about two hundred and fifty feet, approximately, north of the railroad, and I looked to my left up the track, which I always do, looking for the train or the streetcar, and I saw the light from the train and then I heard the whistle and I looked ahead. I see the car coming facing me was down south of the intersection or railroad tracks some two, three hundred feet. I couldn't say for sure. And he seemed to keep coming and the train was getting nearer the street. It just kind of formed in my mind that it looked like they were going to come together at the intersection. And I started to stopping or slowing up.

"The train went across the track or across the street and blocked my view. I could no longer see the other car. But he was very close to the railroad crossing when the train went between us."

It is evident from Hood's testimony that he saw nothing of which the train crew had not taken notice.

*Fish v. Southern Pacific Co.,* 173 Or 294, 143 P2d 917, 145 P2d 991, states:

"The traveler upon a highway, who is about to pass over a railroad crossing, and the operators of the railroad train approaching the crossing simultaneously are under the same obligation, each to the other, to exercise reasonable diligence to avoid a collision, with the exception that the train, being upon a fixed track and more difficult to control than an automobile, is considered to have the right of way. *Robison v. Oregon-Washington R. & N. Co.,* 90 Or. 490, 176 P. 594."

Therefore, the train crew could properly have anticipated as the train neared 92nd avenue that the plaintiff would stop and yield the right of way. The fact that he reduced his speed materially, as he himself conceded, could readily have induced the train crew to believe that he was about to stop.

From the foregoing, it will be seen that the testimony given by the engineer and the fireman that they saw the plaintiff's car when it was 500 to 600 feet from the intersection and kept it in mind until the collision occurred was uncontradicted. The plaintiff and his witnesses mentioned no object that the train crew should have seen but failed to observe. Thus, so far as this case is concerned, the train crew saw and took note of everything which a reasonable lookout ahead could discern. The testimony given by the engineer and fireman was not of a character that it could have been rejected by the jury as palpably false. Neither of those witnesses was shown to have been an unreliable source of the truth. The question now presents itself: did the trail judge err when he denied the defendant's motion "to withdraw from the consideration

of the jury &ast; &ast; &ast; the failure to keep a proper or any lookout."

*Hartman v. Baltimore & Ohio R. Co.*, 89 F2d 425, states:

> "A study of the record convinces us that there is no substantial evidence of any negligence on the part of the defendant railroad company &ast; &ast; &ast;. It is not shown by any substantial evidence that there was failure to keep a proper lookout on approaching the crossing &ast; &ast; &ast;."

We take the following from *Haney v. Missouri Pacific R. Co.*, 214 Ark 673, 217 SW2d 610:

> "The engineer testified that he was keeping the look-out required by law, 6 Ark. Stats.Ann. § 73-1002, and saw the truck as it approached the crossing, but assumed that it was going to stop before it went on the crossing. He further testified that when he realized that the truck was proceeding to cross the track he applied his emergency brake in an unsuccessful effort to slow down the train and avoid the collision. There is nothing in the engineer's testimony, or in the testimony of other witnesses, or in the physical situation shown, that would have justified the jury in refusing to credit his statement, or in finding that those in charge of the locomotive failed to keep a proper look-out, or to act diligently to prevent injury to appellants after their dangerous situation was discovered."

From *Missouri Pacific R. Co. v. Baldwin*, 117 F2d 510, we take the following:

> "The grounds of negligence submitted to the jury were the alleged failure to give a signal, failure to keep a lookout, and running at a speed faster than that justified by public need and necessity. We think that under the law of Arkansas the issues as to the alleged failure to keep a lookout, or as to the alleged excessive speed, should not have been submitted.

"In the recent case of Missouri Pac. R. Co. v. Moore, 199 Ark. 1035, 138 S.W. 2d 384, where an automobile and train collided at a crossing, the fireman testified that he was keeping a lookout and gave warning to the engineer as soon as it became apparent that the automobile was in danger. The Supreme Court of Arkansas held that a jury could not disregard this undisputed evidence. In the present case we find no evidence in the record which contradicts the fireman's statement that he was keeping a lookout and warned the engineer when it appeared the truck was not going to stop. The fireman's testimony is consistent with other facts proven. We think that Missouri Pac. R. Co. v. Moore, supra, is controlling on this issue and that the issue of failure to keep a lookout should not have been submitted to the jury."

The facts of that case were not materially different from those of the instant case. The decision said:

"* * * There was no direct evidence that the fireman was not keeping a lookout, as he said he was."

*Simmons v. Chicago, R. I. & P. Ry. Co.,* 217 Ia 1277, 252 NW 516, says:

"* * * There is nothing in the evidence to indicate that the engineer should have observed the Chevrolet truck sooner, or, after observing it, should have sooner realized that the driver of the truck would not stop before crossing the railroad tracks. Under that state of the record, it was error to submit that issue to the jury."

We take the following from *McGlothin v. Thompson,* 347 Mo 708, 148 SW2d 558:

"* * * Plaintiff's argument is that 'the peril of the Standridge car was discovered by Keatin (head brakeman) as it approached the crossing but no warning was ever given to the engineer;' and that 'this fact, alone, precludes appellant from

successfully contending that the lookout statute was not violated.' But here the engineer also testified 'that the head brakeman was sitting up there in front of (the) fireman, looking ahead.' Moreover, even plaintiff's evidence showed that the engineer did whistle just before he reached the crossing, which was sufficient reason to explain why the brakeman would not tell him to whistle after he saw the car would not stop. The brakeman's testimony has been set out. He said it looked like the car would stop until the engine was within 20 or 30 feet of the crossing and under plaintiff's evidence it must have been whistling then. This, considered with other testimony, may show error of judgment as to what the driver of the car would do but it does not show failure to keep a constant lookout. Jemell v. St. Louis S. W. R. Co., 178 Ark. 578, 11 S.W.2d 449. Furthermore, it is to be noted that the brakeman's testimony corresponds with that of Vinson as to the car slowing down as it approached the crossing. The train must have been very close to the crossing when the car 'started up again', and plaintiff's own evidence shows a whistle starting 100 feet from the crossing. Plaintiff also says that the brakeman's position obstructed the view of the fireman. Even if it did, nothing obstructed the brakeman's view and we are cited no authority, and find none, holding that there must be more than one trainman keeping a lookout on each side of the engine. This is also true as to plaintiff's argument about trainmen on the caboose failing to keep a lookout ahead of the engine."

We believe that the above holdings are sound. They convince us that, since the testimony of the engineer and the fireman was uncontradicted and was not shown improbable in nature, or contrary to common experience, it was controlling and left no issue for submission to the jury. Therefore, since the sole evidence upon the plaintiff's averment that the defendant's employees failed to maintain a reasonable lookout

showed that they saw the plaintiff's car at a distance of 550 feet from the defendant's track, and thereafter, after taking note of its movement, inferred that it would stop before entering upon the track, it cannot be said that the crew did not maintain a lookout ahead. The crew did not fail to see the very object for which the plaintiff says they owed a duty to look; that is, the plaintiff's car, its peril and its movement. It is our belief that the defendant's motion, above quoted, should have been sustained and that error occurred when it was denied.

■ The ninth assignment of error challenges an instruction which told the jury:

"A person who, without negligence on his or its part, is suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to himself or to others is not expected or required to use the same judgment and prudence that is required in the exercise of ordinary care in calmer and more deliberate moments    *    *    *."

We think that it is plain that the plaintiff did not feel, as he approached the crossing, that he was "suddenly and unexpectedly confronted with peril." He conceded that he was aware of the grade crossing as he neared it and that he saw the two signs which gave notice of the railroad track. We have quoted his testimony in which he admitted that he did not see the train with which he collided, and took note of his admission to a police officer that he did not know until others told him "what he hit." It is, therefore, clear that he did not act in an emergency. As nearly as we can ascertain, he drove at the instant of his unfortunate mishap in the same manner as he did normally. The defendant's challenge to the instruction

must be sustained. *Prauss v. Adamski,* 195 Or 1, 244 P2d 598.

█ The question now occurs: do the above errors require reversal. ORS 19.120 says:

"Upon an appeal from a judgment of the circuit court, the same    *    *    *    shall only be reversed or modified for errors substantially affecting the rights of the appellant;    *    *    *."

The errors above mentioned are substantial. The one which erroneously submitted to the jury the plaintiff's charge that the defendant failed to maintain a lookout laid before the jury a basis of recovery upon which one or more of the jurors may have grounded his vote for the plaintiff. It is true, as indicated in a preceding paragraph, that the complaint averred other bases of liability, but the verdict was general and we cannot say that it was so clearly supported by the evidence upon issues as to which no error occurred that the trial court would have been justified in directing a similar verdict thereon. We believe that the errors were prejudicial and require reversal. *State v. Weston,* 155 Or 556, 64 P2d 536; *DeLashmitt v. Journal Publishing Co.,* 166 Or 650, 114 P2d 1018, 135 ALR 1175; *LaFollett v. Jones,* 98 Or 136, 193 P 446; *Fowler v. Phoenix Insurance Co.,* 35 Or 559, 57 P 421; *Maccia v. Tynes,* 39 NJ Super 1, 120 A2d 263.

Reversed.

ON PETITION FOR REHEARING

ON PETITION FOR REHEARING

Bert E. Joachims and Harry G. Spencer, Portland, for respondent.

Lamar Tooze, Lamar Tooze, Jr., and Phillips, Coughlin, Buell & Phillips, Portland, for appellant.

Before PERRY, Chief Justice, and ROSSMAN, LUSK and WARNER, Justices.

ROSSMAN, J.

■ A petition for a rehearing, filed by the plaintiff-respondent, challenges our decision, particularly our holding that the circuit court erred when it overruled the defendant's motion to withdraw from the jury's consideration the charge that defendant's train crew failed to maintain an adequate lookout.

Although the plaintiff-respondent offers several criticisms of our review of the testimony given by the defendant's engineer and fireman, it leaves virtually unmentioned the following statement which forms a part of our decision:

> "The plaintiff presented no direct evidence indicating that the members of the defendant's train crew did not see his vehicle as it drew near the railroad crossing and, therefore, when he rested, the presumption that the defendant had exercised due care in the maintenance of a lookout remained unimpaired so far as the plaintiff's direct evidence upon the subject bore."

It is obvious that unless the record contained evidence capable of supporting a finding that the train crew failed to maintain an adequate lookout, the plaintiff's charge upon that subject could not be submitted to the jury. Criticism of the testimony given by the train crew and of our report of it, even though the criticism is so meritorious that it entirely obliterates the crew's testimony, does not establish that the crew did not maintain a lookout.

Plaintiff-respondent says that we erred when we made the following statement:

> "Masloskie swore that he saw the plaintiff's car when the engine was 550 feet from the crossing."

Masloskie was the engineer. It was the fireman, and not Masloskie, who made the statement that the plaintiff's car was seen when the engine was 550 feet from the crossing. Masloskie testified that he saw the plaintiff's car when it was 550 feet from the crossing. The fireman, William H. Green, referring to the plaintiff's car, gave this testimony:

> "Q About where was the car, Mr. Layne's car—

when I say 'car' I mean pickup truck—about how far from the crossing was it when you first saw it?

"A Well, when I first saw it was when we were way back, probably 500 or 600 feet.

"Q And about how far from the crossing was the car at that time? How far from the crossing was Mr. Layne's truck?

"A He was about the same distance."

Under cross-examination Green gave a detailed account of the movement of the three cars in 92nd Avenue and of his train as the four vehicles approached the crossing. Upon the request of plaintiff's counsel he placed marks upon a large chart which indicated where the vehicles were at succeeding stages of their movement. Masloskie's testimony upon the subject was as follows:

"Q When did you first see the automobile or any automobile?

"A Well, I judge he was back there about 550 feet when I first saw the headlight.

"Q You mean he was 550 feet from the crossing?

"A Yes, 550 from the crossing.

"Q Now when you say 'he' you are referring to the plaintiff, the man that was injured?

"A The man that was driving the pickup."

Since the speed of the train was at least as great as that of plaintiff's car, it may be inferred that the latter was possibly 550 feet or more from the crossing when Masloskie saw it. But we shall not rest upon that. We misstated the testimony that Masloskie gave. Although we made that error, we do not believe that it requires a holding that our previous decision was unsound.

The petition for rehearing states that the engineer, Masloskie, did not notice that a collision was impending until his engine was within 25 feet of the crossing.

Masloskie died before the trial occurred. However, before his death a short examination of him was made by plaintiff's counsel in order to preserve Masloskie's testimony. He testified that when the train "was 25 feet away from the crossing" he was aware that plaintiff's car would not stop. At that point, according to his further testimony, "I just dynamited it—we call it dynamited—put it in full operation." Shortly he was asked:

"Q Up to the time you dynamited it, you made no attempt to slow down?

"A Yes, I drawed off a little air to hold her down so that I could stop."

The fireman, Green, under cross-examination, gave this testimony:

"Q Now, you said to the jury that Masloskie noticed an impending accident when the train was 50 feet from the crossing.

"A That's right.

"Q How do you know that?

"A Well, by—from the crossing to just one car length would be just about 50 feet.

"Q How do you know that he knew the accident was impending at that particular time?

"A Well, I can explain that to you, too, because the last whistle that he was making was interrupted on account of it, and instead of the regular whistle, why, he started a succession of short whistles.

"Q He gave an emergency whistle?

"A Yes.

&ast;   &ast;   &ast;

"Q Now, I believe you testified you could tell by watching the engineer that he knew the car was— a collision was imminent when the train was about 50 feet from the crossing; isn't that correct?

"A That's right.

"Q And did you make that observation because you saw the engineer at that time throw the train into full operation?

"A I could tell by the sound of his whistle that there was going to be an accident.

"Q A collision. And that's when the train was about 50 feet from the crossing; is that correct?

"A Yes.

"Q Now he had before that time made an emergency application of his brakes?

"A You mean—

"Q (interposing) I mean did he first make the emergency application? I believe you call it dynamiting, don't you?

"A That's right.

"Q Did he dynamite before he blew the emergency whistle?

"A He was blowing the whistle and throwing it in emergency all at the same time.

"Q All at the same time.

"A It was just instantaneously."

Green also testified (cross-examination):

"Q Now, as you approached the 92nd crossing, I believe you testified that you—the train was—you threw the throttle off.

"A Yes.

"Q That is, you operated without the full power of the engine?

"A Yes.

"Q And I take it you were drifting?

"A That's right."

For the sake of complete accuracy, we add that the course was slightly downgrade.

Green, the fireman, testified that as the train approached the crossing Masloskie "was sitting just like this with his head out the window." The engine cab

had a broad expanse of glass on all four sides which enabled the crew to see over a wide range. A photograph of one of the locomotives in which a member of the engine crew had his head out the window indicates that one in that position was afforded a good view. Upon cross-examination, Green testified that, although he was looking both to the right and to the left as the train neared the crossing, Masloskie confined himself to the left (the direction from which the plaintiff was approaching).

The brief which accompanies the petition for a rehearing argues that growths of trees and brush in and near the southeast corner of the crossing rendered it impossible for the train crew to have seen the plaintiff's vehicle as the latter and the train approached the site of the impending collision. The brief declares that we failed to give attention to photographs which showed the brush and small trees. It points out: "The height of the brush and trees referred to was estimated by the plaintiff as being up to 15 feet in height." It notes, however, that "the train crew occupied a superior vantage position with respect to the height above the rails at which they could make their observation of traffic on 92nd Avenue." Their "superior vantage position" as pointed out in the brief was due to the fact that the defendant's Diesel locomotive was much taller than an automobile. According to the brief, "the eyes of the train crew would be about 10 or, at most, 11 feet above the rails."

Our decision quoted a part of the testimony given by the plaintiff in which he conceded that when he reached a point in 92nd Avenue "to the south of that house" (150 to 200 feet from the track), he was able to see a train approaching 92nd Avenue from the east

when it reached a point "about the fourth power pole east of 92nd Avenue." Power poles were 100 feet apart. The plaintiff qualified his answer, as our quotation from his testimony indicates, by saying: "If that train was properly lighted." We resorted to that testimony, not for the purpose of showing that the plaintiff should have seen the train before being struck, but in order to point out that when the train crew swore that they saw his headlights, their testimony was not impossible of belief. In other words, since the plaintiff conceded that a motorist, 150 to 200 feet south of the track, could see a locomotive at the fourth power pole east of 92nd Avenue, if the locomotive "was properly lighted," it is manifest that the brush and trees were not an obstruction to an adequate view. Since the train was thereby within the view of a motorist, an automobile which had its headlights burning, like the plaintiff's, could have been seen by the train crew. We must bear in mind that when the plaintiff approached the crossing, seated as he was behind his steering wheel, he was much nearer to the pavement than the train crew in the cab of the engine. Our previous opinion states that one of the photographs which was received in evidence, and which was taken by a photographer who stood upon the track, rendered plainly visible an automobile which was parked in front of the aforementioned house.

We do not believe that we have misinterpreted the photographs. The plaintiff argues that the distances depicted in them were somewhat different from our statement of them. If he is correct in his calculations, and if ours are wrong, the differences are not sufficient to be material.

The brief calls attention to *Newbern v. Exley Produce Express*, 66 Adv Sh 95, and seems to think that

that decision treated the issue of failure to maintain an adequate lookout different from that in the case now before us. In the Newbern case, the defendant's truck, if the plaintiff told the truth, was upon the wrong side of an icy, treacherous pavement. In that case, the defendant was under a duty, created by ORS 483.302, to yield to the plaintiff the part of the pavement upon which its truck was approaching the plaintiff's car. The fact that defendant's driver, notwithstanding the demands of that section of our laws, did not quit the left side but continued upon it was capable of warranting, in our belief, an inference that he did not see the plaintiff's car. In short, it was capable of warranting an inference that he was not maintaining an adequate lookout ahead. In the present case, the defendant's train crew had a right to believe that the plaintiff's car would yield to the train the right of way and, accordingly, the fact that the train did not stop before crossing 92nd Avenue could not justify an inference that the engineer was not maintaining a reasonable lookout.

The petition for a rehearing is denied.