## White v. Commonwealth.

(Decided December 15, 1922.)

### Appeal from Fayette Circuit Court.

1. Criminal Law—Challenges—Exception—Review.—Under the provision of section 281 of the Criminal Code that the decisions of the trial court upon challenges to the panel, and for cause, shall not be subject to exception, such alleged errors cannot be inquired into by this court upon appeal and are not the subject of review, although erroneous.

2. Criminal Law—Insanity as Defense in Criminal Prosecutions.—Although three experts testify on a trial that defendant is of unsound mind, if defendant has testified before the jury at great

length about a great many details and circumstances covering a long period of time, and admits that he knew exactly what he was doing all the morning of the homicide, and knew what his actions were until he pulled his pistol and shot deceased, the verdict of the jury to the effect that he was of sound mind will not be deemed palpably or flagrantly against the weight of the evidence.

3.  Criminal Law—Insanity as Defense in Criminal Prosecutions—Discretion.—Under the provisions of section 156 of the Criminal Code that "If the court shall be of opinion that there are reasonable grounds to believe that the defendant is insane, all proceedings in the trial shall be postponed until a jury be empaneled to inquire whether the defendant is of unsound mind," there is a sound discretion lodged in the trial judge in such circumstances, and his action will only be reviewed and controlled by this court where there has been a palpable abuse of it.

4.  Criminal Law—Insanity as Defense in Criminal Prosecutions.—The discretion conferred upon trial courts in section 156, Criminal Code, does not require of them that they shall upon all occasions when there is evidence or suggestion calling in question the sanity of defendant, stop the proceedings and then and there empanel a jury to inquire into his sanity; but there is rested in such trial courts a sound discretion to do or not to do so, according to the facts and circumstances as they appear during the progress of the trial.

JAS. G. DENNY and WALLACE MUIR for appellant.

CHAS. I DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming.

Appellant was indicted in the Fayette circuit court charged with the murder of Arthur Johnson, and on his trial was found guilty and sentenced to imprisonment for life. The lower court having refused him a new trial, he has appealed.

The evidence as to what occurred at the time of the homicide is practically undisputed except by defendant himself. It is that appellant, who was a farmer living some miles from Lexington, entered the Walnut street entrance to the postoffice on Saturday, 8th of April, 1922, about ten o'clock in the morning, and there saw decedent standing in the lobby of the postoffice talking to appellant's wife; that he immediately went up near to where they were standing with a pistol in his hand and fired several shots, most of which took effect in the body of Johnson, who shortly thereafter died; that at least one

of the wounds was in Johnson's back, and this gives strong credence to the testimony of two witnesses for the Commonwealth, who testified that the first shot was fired while Johnson's back was to appellant, and in substance that appellant had tiptoed up to near where Johnson was and shot him in the back.

On the trial, however, defendant pleaded not guilty and relied upon self-defense and the defense of emotional or temporary insanity, and in support of these pleas he himself testified in substance that he was forty-seven years of age and had been married for about twenty years; that he and his wife had raised a family of children and had lived happily together until a few months before the homicide when the decedent, Johnson, moved into their neighborhood; that shortly thereafter Johnson and his wife became apparently very much interested in each other and that on Saturdays when he came to town and brought his wife with him, as he frequently did, that nearly always they met Johnson and Johnson and his wife, upon such occasions and other occasions, would frequently go off to themselves; that the relations between his wife and Johnson had been the subject of comment in the neighborhood, and he himself had taken notice of it; that he finally, some four weeks before the homicide, requested Johnson to stay away from his wife, telling him that he was causing her to be talked about, and that while Johnson at the time said nothing, he subsequently said to appellant in substance that he must keep out of his, Johnson's, affairs, that he had a pistol and knew how to use it; that shortly after this occurrence he had a talk with his wife on the subject in the privacy of their home, and after insistence upon his part, she admitted to him that she had been unfaithful to him and had sustained illicit relations with Johnson on two occasions in the city of Lexington, and this admission was about two weeks before the homicide. He also testified that when he went into the postoffice he knew his wife was in there, for he had seen her go in, but that he did not know Johnson was in there; that he waited on the corner for some time for his wife to come out and as she did not come, he went in to see where she was and entered at the Walnut street entrance, and then found out for the first time that Johnson was also in the lobby of the postoffice, and that Johnson made a demonstration as if to draw a pistol before he fired the first shot, and that Johnson was in fact facing him when he first fired.

The evidence of the defendant goes into great detail with reference to the relations between Johnson and his wife and the many occurrences at different times and places when he had observed their interest in each other. These occurrences cover a period of several months prior to the homicide and his recitation of them unmistakably evidences a good memory, and strongly suggests a keen and inquiring mind.

Not only so, he testified on cross-examination that on the morning of the homicide he knew exactly what he was doing and knew everything he had done that morning, and remembered everything that had taken place up to that time; that he remembered when he pulled his gun and fired the first shot, but from that time on his mind was a blank.

Three errors are relied upon for reversal: 1st, that the court erred in drawing a special venire of jurors and not delivering to the sheriff a list containing all the names of such jurors so drawn; 2nd, that the verdict of the jury was contrary to the law and evidence and returned as a result of passion and prejudice; 3rd, that the trial court erred to the prejudice of appellant in not stopping the proceedings of the trial and inquiring into the sanity of defendant upon the introduction by defendant of three specialists who testified in their opinion he was insane.

(1) Even though the first complaint was well taken, and the facts with reference thereto constituted an error upon the part of the trial court, it has long been the rule in this court that under the provisions of section 281 of the Criminal Code the decisions of the trial court upon challenges to the panel and for cause shall not be subject to exceptions, such errors can not be inquired into by this court upon appeal and are not the subject of review by it, although erroneous. Leadingham v. Commonwealth, 182 Ky. 291.

But in justice to the trial judge it is only fair to say that this ground of complaint grows out of the following facts as set forth in the opinion of the trial judge denying a motion for a new trial, to-wit: That over three hundred persons were examined before the jury was finally selected, that the selection began at nine o'clock in the morning, and was not concluded until about nine o'clock that night; that the names of all jurors examined were drawn from the wheel and that late in the afternoon when the court adjourned for dinner one of counsel for

defendant said to the trial judge that he hoped the jury could finally be selected that night; that before adjourning for dinner the judge had drawn a number of additional names from the wheel and upon the reconvening of court after dinner those who had been summoned were examined; that about eight o'clock and when eleven jurors had been accepted by both sides, the judge again drew more names from the wheel, among whom were three or four who lived some ten or twelve miles from Lexington; that the judge, having in mind the expressed desire of defendant's counsel that the jury should be completed that night and after announcing the names and addresses of the persons so drawn from the wheel, stated that they lived some distance from the city and it would be difficult for the sheriff to summon them and return at a reasonable hour, and if there was no objection he would lay those names aside and not direct the sheriff to summon them, and to this statement, so made in open court, there was no objection of any kind.

It is perfectly clear from this statement that the action of the trial court was open, above board and beyond criticism, and was taken solely because of the expressed wish of counsel for appellant that the jury should be completed that night; and even if we could review such action of the trial court it may be well questioned whether there was in fact any error of which appellant could take advantage.

(2)   The second ground is based upon the fact that three expert witnesses testified before the jury that from an examination made by them some ten days after the homicide and an examination at or about the time of the trial, in their opinion the defendant was then of unsound mind and was at the time the shooting was done.

This contention grows out of the fact that there was no other expert testimony on this subject, and the argument is earnestly made that in as much as there was no other expert testimony that the jurors in returning a verdict to the effect that defendant was of sound mind at the time of the homicide ignored the overwhelming evidence on this subject, and the verdict must therefore have been returned as a result of passion and prejudice.

It has been said, however, by this court and many other courts that expert testimony is regarded in law as the weakest kind of testimony because it is not only a species of hearsay, but is, from necessity, based upon, in a large measure, the statements of others with reference

not only to the symptoms which may have appeared in the person under investigation, but is further based upon the statement of facts from others about things which are said to have occurred in the past and, from the very necessities of the case, the opinion of the expert is often based upon things said to have happened in the past which, in fact, may never have happened. In this case the experts in giving their opinion as to the sanity of appellant must have based it upon information they got from appellant and his family or friends with reference to his family relations and his family history, all or part of which may have been wholly inaccurate. K. T. & T. Co. v. Humphries, 168 Ky. 611.

When we, therefore, consider the weakness of this class of testimony and consider on the other side the fact that defendant appeared before the jury and testified at great length about a great many details and circumstances covering a long period of time, and admitted on the stand that he knew exactly what he was doing all the morning of the homicide and knew perfectly what his actions were up until he pulled his pistol and fired the first shot, we are not willing to say the verdict of the jury in the light of these things is flagrantly against the weight of the evidence on this issue.

(3) Question number three is based primarily upon the provisions of section 156 of the Criminal Code, which provides as follows:

"If the court shall be of opinion that there are reasonable grounds to believe that the defendant is insane, all proceedings in the trial shall be postponed until a jury be impaneled to inquire whether the defendant is of unsound mind, and if the jury find that he is of unsound mind, the court shall direct that he be kept in prison or conveyed by the sheriff to the nearest lunatic asylum, and there kept in custody by the officers thereof until he be restored, when he shall be returned to the sheriff on demand, to be reconveyed by him to the jail of the county."

The earnest contention is made for appellant that when the three experts testified it then immediately became the duty of the court, under the terms of the quoted section, to stop the proceedings of the trial and impanel a jury to inquire into the then sanity of the appellant. But this contention overlooks the discretion plainly granted in the section to the trial court, and overlooks the interpretation heretofore given to that section

to the effect that the discretion so confided to the trial court will only be reviewed and controlled by this court upon appeal where there has been a palpable abuse of it. Davidson v. Commonwealth, 171 Ky. 488; Turner v. Commonwealth, 191 Ky. 825.

The three expert witnesses did not testify in this case until after the defendant himself had testified; at the time they testified the court already knew from the demeanor and conduct of the defendant upon the stand whether he appeared to be a man of sound mind, the court already knew from the detailed evidence of the defendant going into the *minutiae* of many occurrences covering a period of several months whether he had the appearance of a man of unsound mind; the court already knew that defendant had admitted on the stand that he knew exactly what he was doing all of that morning and that he could and did account for every act of his during that day and for a long period of time prior thereto, and that he had admitted he had full possession of his faculties and knew exactly what he was doing until after he had fired the first shot.

Under these circumstances it was not unreasonable nor unfair to the defendant for the court to be of opinion that he was in fact then a man of sound mind notwithstanding the introduction of the expert testimony referred to.

The discretion conferred upon trial courts in the section quoted does not require of them that they shall, upon every occasion when any defendant on trial can procure some expert testimony to the effect that he is of unsound mind, stop the proceedings, and then and there impanel a jury to inquire into his sanity. If there was any such absolute rule it is easy to see how it would interfere with an effectual administration of the criminal laws, and therefore a sound discretion was placed in them to do or not to do that thing, according to the facts and circumstances as they appeared to them during the progress of the trial.

In this case there was no request whatsoever made of the trial judge to stop the trial and inquire into the defendant's sanity; there was no suggestion made by defendant or his counsel looking to any such procedure, but the question for the first time was made in a motion and grounds for a new trial.

We do not mean to say, however, that under the section quoted if it should appear to a trial judge in the ex-

ercise of a sound discretion during a trial of a defendant that there was probable reason to think that he was then insane, he should wait until the request is made, for under the section it becomes his duty, without regard to request or motion.

Under the facts of this case we are not willing to say that the trial judge abused his discretion in not stopping the trial and ordering an inquiry as now contended for. We see no prejudicial error in the record, and the judgment is affirmed.