THE STATE OF WASHINGTON, *on the Relation of Peter Kuehl et al., Respondents,* v. THE CITY OF SEATTLE *et al., Appellants.*[1]

[1]Reported in 79 P. (2d) 974.

A. C. *Van Soelen* and *Jno. A. Homer,* for appellants.

*Tanner & Garvin,* for respondents.

ROBINSON, J.—In July, 1927, the city of Seattle passed an ordinance providing for the laying out and extension of Twenty-fourth avenue northwest and for the condemnation of certain land for that purpose, the cost of the improvement to be assessed against property specially benefited. The land was condemned and bonds to provide funds for the payment of condemnation awards were issued in January, 1929, all in accordance with the then existing statutes and ordinances.

Respondents are the holders of bonds of the improvement district in the aggregate amount of six hundred dollars. During 1937, they presented interest coupons to the city for payment out of the funds of the district, but payment was refused, on the ground that there was no money on hand. Respondents thereupon demanded that the city issue a warrant drawn on the local improvement guaranty fund established by the city in conformity with the provisions of chapter 141, Laws of 1923, p. 454, as amended by chapter 209, Laws of 1927, p. 308 (Rem. Rev. Stat., §§ 9351-1, 9351-5 [P. C. §§ 1071-1, 1071-5]). The city refusing to issue the warrant, the respondents instituted this proceeding praying for a writ of mandate.

The city demurred for want of facts. Its demurrer was overruled, and upon its refusal to further plead, the lower court entered judgment granting a writ directing the treasurer and comptroller of the city to issue the warrant. The city appeals.

The sole question for decision is whether or not the bonds held by the respondents are "local improvement bonds" within the contemplation of chapter 209, Laws of 1927, and entitled to the advantages and protection of the local improvement guaranty fund established in conformity with the provisions of that act. In attempting to solve the question, we have traced the legislative history and examined the text of three several lines of very intricate statutes without getting any very clear light on the matter. The question is a difficult one, and one which cannot be answered in either way with a satisfied feeling of complete conviction. It is one, however, to which answer must be made, and we have come, though somewhat hesitatingly, to the conclusion that the ruling of the trial court was correct.

In 1911, the legislature passed an act (chapter 98, p. 441) authorizing cities to provide for the creation of "local improvement districts" and the issue of "local improvement bonds" payable out of funds to be raised by special assessments upon the property within the local improvement district. This act, which will hereinafter be referred to as the "local improvement act," repealed numerous prior acts and has itself been amended from time to time. As existing, it appears in Rem. Rev. Stat. as §§ 9352-9425, inclusive.

In 1907, the legislature passed an act (chapter 153, p. 316) authorizing cities to condemn property for the opening and widening of streets and for other public purposes, and to assess the cost thereof, in whole or in part, against the property specially benefited. The act re-enacted many of the provisions of chapter 84, Laws of 1893, p. 189, and chapter 55, Laws of 1905, p. 84, but without any express reference to them. This act authorized the establishment of "special assessment districts" and the issue of bonds, payable out of funds to be raised by special assessments upon the property in

such districts, with which to pay the condemnation awards. This act, which will be hereinafter referred to as the "eminent domain act," has also been amended from time to time, and, as existing, it appears in Rem. Rev. Stat. as §§ 9215-9279 [P. C. §§ 7545-7608].

The amendatory act of 1915 (chapter 154, p. 446) incorporated into the eminent domain act many, if not most, of the sections of the local improvement act relating to the issue of local improvement bonds. Section 10, p. 452, is the same as § 46, p. 471, of the local improvement act of 1911. Section 11, p. 453, is the same as § 47, p. 472, of the local improvement act. Section 12, p. 453, is substantially the same as § 48, p. 472, of that act, with the exception that it provides that the proceeds of the bonds shall be applied to the payment of "awards, interest, and costs of the improvement," instead of "the cost and expense of the improvement." Section 13, p. 454, is substantially the same as § 49, p. 473, of the local improvement act of 1911, as amended, and § 15, p. 456, is the same as § 51, p. 474, of that act. Section 16, p. 456, is the same as § 52, p. 474. Section 17, p. 457, is substantially the same as § 53, p. 475. Section 18, p. 457, is substantially the same as § 54, p. 475.

Throughout these provisions of the eminent domain act, the improvements are denominated "local improvements," the districts are referred to as "local improvement districts," and the interest on the bonds is directed to be paid "out of the respective local improvement funds from which they are payable." It is said in respondent's brief, and, although we have not ourselves made a count of the matter, we do not doubt the truth of the statement, that the term "improvement" or "local improvement" is used more than sixty times in the eminent domain statutes.

The city itself has not only used the term "local im-

provement," as designating the result of an eminent domain proceeding, but it has, at least in one instance, called the bonds issued in such a proceeding "local improvement district bonds." In January, 1928, the city passed ordinance No. 54547, regulating eminent domain proceedings. In that ordinance, the city provided a bid form for bonds to be issued and sold, which reads, in part, as follows:

"BID FORM FOR IMPROVEMENT BONDS
CITY OF SEATTLE

"Mr. ......................................................................,
"Comptroller of the City of Seattle,
"Seattle, Washington.
"Sir:
"For *Local Improvement District Bonds* of the City of Seattle, . . ." (Italics ours.)

Presumably, the respondents' bonds were originally purchased by their predecessor in interest upon such a bid, for ordinance No. 56171, passed in October, 1928, providing for the payment of the costs and expense of the condemnation of Twenty-fourth avenue northwest, provides that it shall be paid by the issuance and sale of bonds, as provided for by the statute and general ordinance No. 54547. It should be noted, however, that, in addition to the bid form, that ordinance also recited the bond form, and that was as follows:

"Local Improvement Bond Condemnation Award, District No. —— of the City of Seattle, State of Washington."

In the actual printing of the bonds, as is shown from facsimiles in the record, the first three words "local improvement bond" are given special prominence, both on the cover and in the body of the instruments.

We come now to the third series of statutes, those providing for the guaranty fund. Chapter 138, Laws of 1917, p. 576, Rem. Rev. Stat., § 8986 [P. C. § 1066] *et*

*seq.,* was the first of these. It was a permissive act applying to first class cities only. Chapter 141, Laws of 1923, is a permissive act for all cities and towns. Chapter 183, Laws of 1925, Ex. Ses., p. 551, made the establishment of such a fund mandatory for all cities and towns, except those having a population of three hundred thousand or more, or cities operating under the act of 1917. Chapter 209, Laws of 1927, made the establishment of a guaranty fund by the city of Seattle mandatory because it "established" the fund "in any city of the first class having a population of more than three hundred thousand."

Since chapter 209, Laws of 1927, is entirely in the form of an amendment to chapter 141, Laws of 1923, its construction must be begun by considering the terms of that act. The act is too long to quote. It will be noted, however, upon examining it, that it in no way makes any reference to either the local improvement act or the eminent domain act. It is, therefore, impossible to argue that it is in any way definitely tied in with either.

Our specific problem is to determine what the words "local improvement bonds" mean, as used in § 1, p. 308, Rem. Rev. Stat., § 9351-1 [P. C. § 1071-1], of the amendatory act of 1927:

*"There is hereby established for each city and town in the state a fund for the purpose of guaranteeing,* to the extent of such fund and in the manner hereinafter provided, *the payment of its local improvement bonds and warrants for any local improvement ordered;* . . ." (Italics ours.)

■ Appellant first contends that the eminent domain act and the local improvement act are two separate statutes, each one complete in itself and each dealing with a different subject, the one providing for a judicial, and the other for a non-judicial, procedure.

This is quite true. But, as we have already seen, the nomenclature used in the two acts has been greatly confused in the acts themselves, the bonds issued under authority of both acts have, in common speech, been referred to as "local improvement bonds," and bonds issued in eminent domain proceedings have even been referred to in the ordinances creating them as "local improvement district bonds." There can be but little doubt that only a very few persons appreciate that there is any distinction between bonds issued by local improvement districts to pay for property condemned and those issued to pay the costs of physical improvements.

The appellant next contends, and this, in our opinion, is by far its most formidable contention, that, in enacting § 4 of chapter 209, p. 311, Rem. Rev. Stat., § 9351-4 [P. C. § 1071-4], the legislature had in mind only that class of bonds issued to pay for physical improvements. This section provides, in substance, that no city or town shall order any improvement to be paid for by special assessments where the estimated cost to be assessed, when added to all other outstanding and unpaid local improvement assessments, shall exceed the actual value of the real property of the district, exclusive of improvements thereon. It is argued with great force that the legislature, in enacting this section, must have had in mind physical local improvements only, because, when an eminent domain proceeding is ordered, neither the cost nor the boundaries of the district are or can be known.

It is further said that the provisions of the section permitting the owners of seventy-five per cent of the frontage and the area of lands in the district to deposit cash equal to the amount that the estimated cost of the improvement may exceed the limitation, and thus permit the improvement to go on, cannot possibly

refer to an eminent domain proceeding. We are not convinced that it is altogether impossible to apply the provisions of § 4 to an eminent domain proceeding. After condemnation awards are made, the city may reject them and discontinue the proceedings. It is argued that this action is a negative one and the only one left to the city at that stage of the proceedings. But in this case, and we take it that the case is typical, the city took affirmative action. The record shows that the city instituted the condemnation proceedings by ordinance passed on July 18, 1927; that findings, judgment, and decree were entered on April 19, 1928, fixing the amount of the awards, and, although the original ordinance contemplated the assessing of the whole cost on the property specially benefited, the formal ordinance creating the district and providing for the issue of the bonds was not passed until October 1, 1928. That would appear to be an affirmative act after the cost, and limits of the district, were known, and it would seem that the proceedings could have been discontinued if it appeared that to proceed would violate the provisions of § 4.

It is also contended, because § 5, p. 456, of the 1923 act was amended by adding a reference to a provision in the local improvement act without any reference to a correlative and, indeed, identical provision in the eminent domain act, that the legislature had in mind only physical local improvements. This is a reasonable inference, but it is not impossible that, when the amendatory act was drawn, it may have been mistakenly thought, since the provisions were identical, that a reference to one of them was sufficient. The provision actually referred to is now Rem. Rev. Stat., § 9405 [P. C. § 1040]. The corresponding and identical provision in the eminent domain act is § 9268 [P. C. § 7597].

■ It is further contended that the administrative construction of the act should be given great weight. But the administrative construction shown and relied upon is that given by the officers and agents of the city of Seattle only. The act applies to all cities. The rule of administrative construction cannot be applied in such a case, for such a practice might result in as many different constructions as there are cities subject to the act. *Chicago Union Traction Co. v. Chicago,* 209 Ill. 444, 70 N. E. 659; *Twohy Bros. Co. v. Ochoco Irr. Dist.,* 108 Ore. 1, 210 Pac. 873, 216 Pac. 189.

■ The act says that the fund is established for each city and town in the state to "guarantee the payment of its local improvement bonds and warrants issued to pay for any local improvement ordered." The appellant concedes that, in the ordinary sense of the words, the acquisition of land for a street may be spoken of as a local improvement, but it says that the words have acquired, in this state, a technical, legal significance, and, when used in our statutes, refer only to physical improvements. We have held otherwise.

In the case of *In re Western Avenue,* 93 Wash. 472, 161 Pac. 381, this court construed the term "local improvement," when employed in a general statute, to include the extension and establishing of streets by eminent domain. In 1910, the city council of Seattle passed an ordinance providing for the laying off, extending, and establishing of Western avenue, and for the condemnation of the necessary land. In this proceeding, certain lands belonging to the state were assessed. The statute provided, with reference to the assessment of state lands for local benefits, that all lands of the state, except tide lands situated within the limits of any incorporated city,

" ' . . . may be assessed and charged for the cost of local improvements specially benefiting such lands

which may be ordered by the proper authorities of any such city.' "

It was conceded that the state lands sought to be assessed were not tide lands, but the state resisted assessment upon the ground that "local improvements" meant only " 'actual physical improvement of the land by the formation of an improvement district under the local improvement act.' " The court refused to construe the words in this narrow sense or to hold that they had any such technical, legal meaning, but quoted the following definition from a text:

" ' "A local improvement within the meaning of the law is an improvement which by reason of its being confined to a locality enhances the value of property situated within the particular district, as distinguished from benefits diffused by it throughout the municipality." ' "

It accordingly held that the condemnation of land for the extension and laying out of Western avenue was a "local improvement" within the meaning of the general statute there involved.

The *Western Avenue* case, holding "local improvements" to include the opening and extension of streets through eminent domain proceedings, was decided in 1916, at a time when both the eminent domain act and the local improvement act had assumed, substantially, their present form through the 1915 amendments; and, what is of more significance, it was decided about three months prior to the passage of the first of the guaranty fund acts in 1917. That act spoke of the bonds to be guaranteed as "bonds issued against local improvement districts," and all succeeding guaranty acts have purported to cover bonds issued to pay for local improvements.

It is said, however, that the holding in the *Western Avenue* case must be interpreted in the light of the

purpose of the statute construed; and that the court, in deciding the case, was doubtless influenced by the fact that it would be highly illogical to conclude that the legislature intended that the state should be assessed for one kind of local improvement and not for another. But if this course of reasoning is sound, and we think it is, it applies with even more force in the instant case. In speaking of the 1917 guaranty fund act, the court said in *Comfort v. Tacoma,* 142 Wash. 249, 252 Pac. 929:

"Prior to 1917, many of the cities of the state of Washington had outstanding local improvement bonds which were unpaid, and practically valueless. The failure to meet these bonds at maturity was due to many causes, including the lack of necessary restrictions to prevent pyramiding assessments, but the ultimate result thereof was to impair the credit of the cities of the state, and a consequent lowering of the value of the bonds. Countless numbers of these bonds were purchased by persons unskilled in such matters who failed to grasp the fact that the obligations which the bonds represented were not legally those of the city, but were restricted to the particular fund created by the assessment, although bearing upon their face words indicating to the casual observer a promise to pay by the municipality.

"The legislature, in an endeavor to remedy this state of affairs, passed a statute (Laws of 1917, p. 576, ch. 138) [Rem. Comp. Stat., §§ 8986 to 8991], which provided in substance that any city of the first class could by ordinance create a fund for the guarantee of the payment of local improvement bonds issued subsequent to the passage of the ordinance."

In 1935, the court, in surveying the entire series of guaranty fund statutes, said, in *State ex rel. Washington Mutual Sav. Bank v. Bellingham,* 183 Wash. 415, 48 P. (2d) 609:

"In considering the legal questions to be here determined, the legislative history of the acts above referred

to is important. It is clear that, since 1917, it has been the endeavor of the legislature to place municipal local improvement district securities upon a better financial basis than that upon which they previously rested. Manifestly, the statutes referring to guaranty funds have been progressively strengthened and widened in their application, so as to give effect to the evident legislative policy."

The bonds involved in this case are certainly municipal local improvement securities. It would be illogical to suppose that the legislature intended to provide a remedy as to but one of two classes of such securities when the precise evils sought to be remedied existed as to both.

It is our opinion that the words "local improvement bonds," used in the first section, chapter 209, Laws of 1927, must be construed as including bonds issued to pay for local improvements made through eminent domain proceedings.

The judgment and decree appealed from is accordingly affirmed.

STEINERT, C. J., MAIN, HOLCOMB, MILLARD, and SIMPSON, JJ., concur.

GERAGHTY, J. (dissenting)—I find myself unable to concur in the majority opinion. It must be conceded, as the majority opinion states, that the solution of the question involved is not wholly free of difficulty.

Section 1 of the guaranty act, chapter 209, Laws of 1927, p. 308 (Rem. Rev. Stat., § 9351-1 [P. C. § 1071-1]), establishes for each city and town in the state a fund for the purpose of guaranteeing, to the extent of such fund and in the manner provided, the payment "of its local improvement bonds and warrants issued to pay for any local improvement ordered." Bonds and warrants issued under the eminent domain act and payable from special assessments on benefited property

are unquestionably local improvement bonds in a proper sense. Indeed, special assessments for their payment can be levied on no other basis than that the improvement, for which they are issued, is local and special in character, rather than general.

As the majority opinion points out, we have to do with three laws: The eminent domain act; chapter 98, Laws of 1911, p. 441, as amended, generally referred to as the local improvement act; and the local improvement guaranty act.

The evil sought to be remedied by the enactment of the guaranty act was the fact that many of the cities of the state had outstanding local improvement bonds which were unpaid and practically valueless. The failure to meet these bonds at maturity was due to many causes, the chief of which was the lack of adequate restrictions against the pyramiding of assessments. *Comfort v. Tacoma,* 142 Wash. 249, 252 Pac. 929.

The local improvement code limited the amount that could be assessed for making a single local improvement to a prescribed percentage of the value of the property in the district to be assessed, but contained no restriction on the power of the city to pyramid assessments by ordering successive improvements chargeable to the same property and aggregating much more than the value of the property assessed.

To correct this practice, § 4, p. 311, of the guaranty law (Rem. Rev. Stat., § 9351-4 [P. C. § 1071-4]), provides:

"No city or town operating under the provisions of this act shall order any improvement to be paid for, in whole or in part, by local assessment where the estimated cost of such improvement, if such cost is all to be assessed to the property in the district, or that portion of the estimated cost to be assessed, if a portion only of said total cost is to be assessed, when added to

all other outstanding and unpaid local improvement assessments against the property included in the district, excluding penalties and interest, shall exceed the actual value of the real property, exclusive of improvements thereon, within the district according to the valuation last placed upon it for the purposes of general taxation;  .  .  .

"Before ordering any improvement hereunder the council or other legislative body of a city or town shall require and receive a report from the proper board, officer or authority designated by charter or ordinance, certifying in detail the local improvement assessments outstanding and unpaid against the property in the proposed district together with the aggregate of the actual value of the real property in the district, exclusive of improvements thereon, according to the valuation last placed upon it for the purpose of general taxation. .  .  ."

Now, it seems to me that § 4 indicates that the legislature had in mind only improvements ordered under the local improvement code, and was not intended to apply to condemnation assessments under the eminent domain act.  The procedure outlined in the latter act cannot be made to integrate with the requirements of § 4 of the guaranty act.  When the city council orders a condemnation under the eminent domain act, it can have in advance no definite estimate of what the award in condemnation will be.  If the city is dissatisfied with the amount of the award, it may, within a specified time, discontinue the condemnation proceedings by paying, or depositing with the court, all taxable costs incurred by any of the parties up to the time of discontinuance; if it desires to complete the condemnation and levy assessments to pay the condemnation award, it may file a supplemental petition with the superior court asking that an assessment be made for the purpose of raising the amount necessary to pay the compensation and damages awarded for the property taken or damaged; thereupon the court refers the matter to

the eminent domain commissioners appointed by it, and the procedure thereafter, in the levy of assessments, is wholly under control of the court.

By the statute, Rem. Rev. Stat., § 9237 [P. C. § 7567], it is made the duty of the eminent domain commissioners:

" . . . to examine the locality where the improvement is proposed to be made and the property which will be especially benefited thereby, and to estimate what proportion, if any, of the total cost of such improvement will be a benefit to the public, and what proportion thereof will be a benefit to the property to be benefited, and apportion the same between the city and such property so that each shall bear its relative equitable proportion, and having found said amounts, to apportion and assess the amount so found to be a benefit to the property upon the several lots, blocks, tracts and parcels of land, or other property in the proportion in which they will be severally benefited by such improvement: . . ."

It will thus be seen that the city council cannot in advance know how much of the award will be assessed against the city and how much against benefited property, nor can it know what property will be assessed by the eminent domain commissioners unless it has defined the district in the ordinance directing the condemnation, as it has power to do; but, even where it has defined the district, it cannot know what portion of the cost will be assessed against the district so created. The eminent domain commissioners spread the assessment without reference to any outstanding assessments.

Another feature of the guaranty law seems to me to furnish a forceful argument in support of the view that the law was intended to apply only to bonds issued under the local improvement act. Rem. Rev. Stat., § 9405 [P. C. § 1040], being part of that code, provides that neither the holder nor owner of any bond issued under authority of the act shall have any claim there-

for against the city, except from the special assessment; and a copy of this section is required to be plainly printed or engraved on each bond issued.

Rem. Rev. Stat., § 9268 [P. C. § 7597], found in the eminent domain act, in identical language limits the right of the holder of bonds issued under that act to the assessment, and provides for printing a copy of that section on each bond issued. Now, § 5, p. 312, of the guaranty law (Rem. Rev. Stat., § 9351-5 [P. C. § 1071-5]), provides that the remedy of the holder or owner of any bond guaranteed by the city, in case of nonpayment, shall be confined to the enforcement of the assessments and to the guaranty fund, and that

" . . . A copy of the foregoing part of this section shall be plainly written, printed or engraved on each bond issued and guaranteed hereunder, and the writing, printing or engraving shall be *deemed sufficient compliance with the requirements of section 9405 of Remington's Compiled Statutes.*" (Italics ours.)

It seems to me that the specific reference to § 9405, coupled with the failure to make reference to the corresponding section in the eminent domain act, compels the conclusion that the legislature intended the guaranty law to apply only to bonds issued under the local improvement act.

The majority opinion says that it is impossible to argue that the guaranty law is in any way definitely tied into either the eminent domain act or the local improvement act. Reference to §§ 4 and 5 of the guaranty act will show that it is very definitely tied into the local improvement act, § 4 by necessary implication and § 5 by specific reference.

For the reasons given, I dissent from the majority opinion.

BEALS and BLAKE, JJ., concur with GERAGHTY, J.