Argued June 28; affirmed July 6; rehearing denied
September 6, 1939

# STATE *v.* NELSON

(92 P. (2d) 182)

In Banc.

*George Mowry*, of Portland (John Mowry, of Portland, on the brief), for appellant.

*Oscar Hayter*, of Dallas (L. G. English, District Attorney, of Lincoln county, on the brief), for respondent.

BEAN, J. The defendant, Henry Stanley Nelson, a man of the age of 33 years, was indicted by the grand jury of Lincoln county, Oregon, on the 29th day of July, 1938, upon a charge of murder in the first degree. He was thereafter brought to trial upon this indictment on September 20, 1938, resulting in a conviction of manslaughter, and he was sentenced to imprisonment in the Oregon penitentiary for the definite period of nine years. From this judgment and sentence defendant appeals.

The indictment in this cause alleged that the said defendant, Henry Stanley Nelson, on the 18th day of July, A. D. 1938, in the county of Lincoln, state of Oregon, unlawfully, feloniously, purposely and of deliberate and premeditated malice, killed one Richard C. Earl by shooting him with a Colt's automatic pistol.

The defendant interposed two defenses: First, the defense of self-defense; and, second, the defense that he was insane and mentally defective at the time of the alleged commission.

The record in this case does not contain the transcript of all the testimony. The bill of exceptions, however, includes, among other things, first, a transcript of an oral statement made by defendant to the state police within two or three hours after the fatal shooting; second, a motion filed in behalf of the defendant on the 29th of July, 1938, immediately upon the return of the indictment, for the appointment of experts to examine the defendant as to his mental condition; third, an affidavit of Dr. Robert P. Smith, alienist and psychiatrist, supporting said motion and filed therewith; fourth, an affidavit of Lena Nelson, the mother of the defendant, supporting said motion and filed therewith; fifth, a transcript of all the testimony re-

ceived or offered, and of all proceedings had, at the hearing of and upon said motion, which hearing was conducted by the circuit court on the 29th day of July, 1938, immediately after the filing of the motion; sixth, a certified copy of an order made by said circuit court on the 29th day of July, 1938, overruling said motion; seventh, a transcript of the whole cross-examination, examination by the court during the cross-examination and redirect examination of the defendant, Henry Stanley Nelson, at the trial of this cause in September, 1938; eighth, a transcript of a portion of the direct examination of defendant at said trial.

The bill of exceptions discloses practically the following: During the middle of July, 1938, the defendant, Henry Stanley Nelson, and a girl several years younger than himself, by the name of Lucille Coenenberg, with whom he claimed to be in love, were vacationing at Newport, Lincoln county, Oregon. The defendant had a wife living, but the couple were childless and had been living apart from each other for a year and a half, she having run away with another man, and it was the defendant's intention to procure an immediate divorce, and, in fact, he had already paid an attorney in Portland a substantial fee to start a divorce suit, which suit, however, as Lucille Coenenberg knew, had not been commenced.

On Sunday night, July 17, in the neighborhood of 11 o'clock, the defendant and Lucille Coenenberg, who had gone out for a ride in the defendant's automobile, stopped in at the Whale Cove Inn, a hotel between Newport and Depoe Bay, and there they met for the first time the deceased, Richard C. Earl, who at that time was operating a small pleasure boat, the "Pauline B", in the vicinity of Depoe Bay. After defendant and

Richard C. Earl had had a few drinks together at this Inn, on this Sunday night, the defendant explained to Earl that he and Lucille Coenenberg were in love with each other and wished to marry each other, but that he was not yet divorced from his wife, and the defendant asked Earl whether it would conflict with the laws of this country if Earl, as the master of this boat, should take them out in his boat on the high seas beyond the twelve-mile limit and perform a marriage ceremony for them and give them "the Lord's blessing out at sea." According to defendant's testimony, Earl assured him that the performance of such a marriage ceremony over defendant and Lucille Coenenberg by himself on the high seas would not conflict with the laws of this country. Earl told the defendant that he would take the defendant and Lucille Coenenberg out on the high seas in the "Pauline B" that very night and perform this so-called marriage ceremony and give them the "Lord's blessing" on the high seas for a fee of $20, to which defendant agreed. Thereupon, about midnight, the defendant, Lucille Coenenberg and Earl left the Whale Cove Inn with the intention of making this trip to the high seas that night for the purpose just indicated.

A few minutes later, by appointment, the three of them, the defendant, Lucille Coenenberg and Earl, met at a resort at Depoe Bay called the Cliff House, which is located a mile or so north of Whale Cove Inn, where they were joined by Everett Munson, a resident of Depoe Bay, whom Earl had arranged to take along with him on the trip to help handle the boat. Defendant, in the meantime, had borrowed a Bible to be used in the ceremony. About half past 1 on the morning of July 18, the four of them, the defendant, Lucille Coenenberg,

Earl and Munson, boarded the "Pauline B" in the cove at Depoe Bay and headed out for the high seas. After they had been out on the ocean for an hour or so, Earl, who, according to defendant's testimony, had been drinking heavily of the beer and other liquor that they had taken along with them, took the Bible that defendant had brought along, and, using this Bible for the purpose, went through the form of a marriage ceremony, joining defendant and Lucille Coenenberg in a form of marriage. Munson at this time and thereafter was steering the boat.

The defendant further states that almost immediately after this "marriage ceremony" was performed, Earl, who had performed it, began to make improper advances to the "bride." According to the testimony of the defendant, Earl actually tried to ravish her there on the boat after this "marriage ceremony" had been performed. They finally returned to shore at Depoe Bay shortly before 6 o'clock in the morning. While on the boat the defendant had paid Earl in cash $7 of the $20 fee agreed upon, and it was understood between them that at the close of the trip the rest of the money would be paid. Upon their arrival at the shore, the four of them immediately went to defendant's automobile, which was parked at the seawall at Depoe Bay, and in which, in the glove compartment which was locked, the defendant kept his check book and other valuables. As they approached the automobile angry words passed between Miss Coenenberg and Earl, she accusing him "of being no gentleman." The defendant had a loaded Colt's automatic pistol in his automobile in the same glove compartment where his check book was. Munson, the companion of Earl, had made no

attempt to prevent Earl from making improper advances to Miss Coenenberg, it is claimed.

Naturally the beach at Depoe Bay was practically deserted at that early hour in the morning. Consequently, when defendant reached his automobile and unlocked the glove compartment to get his check book, he, according to his testimony, took out of this glove compartment not only his check book but also his pistol. He states that he immediately laid this pistol upon the floor board of the automobile, and that he did this in order that he might be able to get it conveniently for his own protection and the protection of Lucille Coenenberg against Earl, in the event that such protection should become necessary. He further states that while he was busying himself with the check book, Earl suddenly picked up this pistol and pointed it at the defendant. A struggle for the pistol ensued, and, according to defendant's testimony, Earl shot at defendant once with this pistol, which was the first shot fired. The struggle between the two men was described by defendant in his testimony as follows:

"A. I heard the shot flashed between us. The first thought that entered my mind was that I was shot and couldn't feel it. The next thing I became conscious of was the gun was free in my hand loose, by the barrel. I quickly reversed it and fired two shots. We were still struggling close together. Fired two shots which only seemed to make him struggle all the harder and I fired two more and he fell."

The death of Earl was instantaneous, and within a few minutes thereafter the defendant was arrested. At about 7 or 8 o'clock that same morning, about two hours after the shooting, he made a statement to the state police in the presence of Sergeant Mulkey and

Harley Youngblood. The defendant was asked his name, age, where he was born and his address, and, among others, was asked the following questions:

"Q. What happened when you left the boat?

A. Well, I am kind of in a spot. I never thought I would be fighting for my life.

Q. What happened when you left the boat Mr. Nelson?

A. May I have that brief case. (Looks through brief case, and then looks for calendar).

Q. Today is Monday.

A. Perhaps I would like a cigarette.

Q. What is your occupation? Salesman?

A. It was.

Q. Did you shoot this man this morning?

A. In self defense.

Q. How many times did you shoot him?

A. I don't remember.

Q. More than once?

A. I think so."

Then follows a long examination, all of which indicated that the defendant knew all of the circumstances and realized the condition and made answers to the various questions in an intelligent and shrewd manner. The statement continues:

"Q. Where did you buy this gun that you have?

A. Portland.

Q. Who from?

A. I don't think it is a crime to buy a gun.

Q. No, not a thing wrong with that.

A. I understand that anyone can own a gun.

Q. Yes.

A. It is going in these records?

Q. Yes.

A. The man I bought it from doesn't have a license to sell a gun.

Q. Did you buy it from a store or a private person?

A. I think a store—I don't remember where I got that gun.

Q. How much did you pay for it?

A. $20.00.

Q. Is it paid for?

A. Fully.

Q. How long have you had the gun?

A. About three weeks, possibly longer.

Q. You got the permit June 17th. How long did you have the gun before that?

A. About three days. The man that took my wife a year and a half ago came up on my front porch with the gun in his pocket. He was going to kill me unless I told him where my wife was. I slipped to the telephone and called a prowl car and the officers came. I said 'I don't know how much this man has been drinking, or what his intentions are, but you should watch him.' They took him off my front porch and took the .32 automatic from him. I have a witness that saw him an hour before. He said that unless I told him where my wife was he would put the gun in my stomach and shoot me. That was M. F. Wicker.

Q. How much wine did you have last night?

A. (To Mr. Youngblood) How much did he buy from you?

Q. (Mr. Youngblood) About five quarts of beer.

Q. Who bought the beer?

A. I did.

Q. Did you take some wine with you?

A. A little gin fizz.

Q. You said you took some wine?

A. Well, it was called wine.

Q. Who drank all that beer?

A. The man I shot did.

Q. You drink any?

A. A sip of it.

Q. Did the pilot drink any?

A. Yes.

Q. Did the lady with you drink?

A. Just a sip.

Q. Were you seasick?
A. No.
Q. Did you have any words with this man out at sea?
A. No.
Q. Did you ever confront him with insulting the girl?
A. No.
Q. Where were they when he tried to ravish the girl?
A. In the forecastle.''

The examination is too lengthy to publish in full here.

Defendant assigns that the court erred in failing to follow chapter 293, Oregon Laws for 1937, and in overruling the defendant's motion for the appointment of experts to examine the defendant as to his mental condition. That act provides in part:

''If before or during a trial in any criminal case the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court immediately shall fix a time for a hearing to determine the defendant's mental condition. The court may appoint one or more disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party.''

From the statement made by defendant before the police officer and from the testimony produced, the court was not of the opinion that the defendant was mentally defective to the extent that he was unable to understand the proceedings against him or to assist

in his defense. Therefore the court overruled the motion.

It appears that the defendant was by occupation a salesman of the high pressure type. He states that he had previously worked for the Brown Milling Company as their highest paid salesman. At the time in question he was a salesman for Charles Scribner & Sons. He apparently dressed well. He belonged to the Lake Oswego Club.

██ Whether there were reasonable grounds to believe that the defendant was insane, under chapter 293, Oregon Laws 1937, was a question for the discretion of the trial court: *State v. Peterson*, 90 Wash. 479, 156 P. 542; *People v. McElvaine*, 125 N. Y. 596, 26 N. E. 929; *State v. Stone*, 111 Or. 227, 226 P. 430; 16 C. J. 789, 790, § 2015. There was no abuse of discretion on the part of the trial court to refuse to have a further hearing under the circumstances: *People v. Keyes*, 178 Cal. 794, 175 P. 6; *People v. Fountain*, 170 Cal. 460, 150 P. 341; *People v. Kirby*, 15 Cal. App. 264, 114 P. 794; *White v. Commonwealth*, 197 Ky. 79, 245 S. W. 892; *State v. Church*, 199 Mo. 605, 98 S. W. 16.

The rule is well established under the statutes of other states providing for such preliminary examinations and hearings, as shown by the authorities first cited. Before the enactment of chapter 293, Oregon Laws 1937, this court held that in the absence of a statute this question was one for the discretion of the trial court: *State v. Stone*, supra.

In the examination before the police officer, defendant's Exhibit 4, the defendant's statements showed in some detail his ability to answer questions and to tell a coherent story of what occurred. The evidence showed that he appreciated the danger of his position. On the

basis of this evidence the trial court held that there were not reasonable grounds to believe the defendant was so insane as to be unable to understand the proceedings against him and to assist in his defense.

■ The defendant was not denied any right or prejudiced by the ruling of the court. He could and did have the question as to his insanity submitted upon the trial. Although the court refused to order a preliminary examination, defendant's attorneys were expressly given permission to renew the motion at any time before the trial. Over six weeks elapsed before the trial but the motion was never renewed. At the trial the defendant showed himself to be fully able to testify as a witness in his own behalf and otherwise to aid in the defense of his case. At all times he showed himself able to understand the nature of the charge against him. Likewise, other expert and competent medical witnesses who were subsequently called to testify for the state did not support the testimony of the defendant's expert witness, Dr. Smith. Dr. John C. Evans testified that the defendant knew the difference between right and wrong when he did the shooting, and Dr. Henry H. Dixon, another expert, testified that an examination of the defendant revealed no insanity which would affect the present case. Although these witnesses testified as to the question of the mental condition of defendant at the time defendant shot Richard Earl, there has been no contention that the defendant's mental condition was changed at any time during the period, except the statement of defendant's witness, Dr. Smith, that defendant was more nearly normal when he was not excited. The verdict shows that in the opinion of the jury the defendant was not insane. It is stated that defendant, in helping with the defense of his case, not

only testified but also took copious notes of the entire testimony, which he extended and analyzed for the benefit of his attorneys after court hours.

Under all of the circumstances, there is no prejudice to the rights of the defendant by the denial of a preliminary hearing on the question of present insanity.

In *People v. Hettick*, 126 Cal. 425, 58 P. 918, it is held that there was no prejudice to the defendant in the failure to hold a preliminary hearing, when it appeared during the trial of the case that there was no insanity and that the trial judge had no reason to change his mind concerning that question.

It is assigned that the court erred in overruling, on the 20th day of September, 1938, defendant's motion for a postponement of the trial.

Defendant contends that he had a constitutional right to be fully represented by counsel of his own selection. The writers of defendant's brief say that they are fully aware that usually and ordinarily a motion for the postponement of a trial rests entirely in the sound discretion of the court. They contend that the circumstances of this particular case, however, are most unusual and most extraordinary.

At the time defendant pleaded to the indictment on August 4, the court appointed the 14th day of September as the time for trial of the case. Thereafter, on September 1, 1938, the court changed the date of trial from September 14 to September 19, 1938. However, on September 19, notwithstanding that the present attorneys for the defendant had already been fully paid in advance by the defendant's family to conduct his defense, the defendant suddenly announced to the court that he was discharging these attorneys and desired to have either Frank B. Reid of Eugene, Oregon,

or Jerry Geisler of Los Angeles, as his attorney. The court thereupon appointed Frank B. Reid of Eugene as attorney for defendant, with the express understanding that the attorneys already in the case would remain, and he continued the trial to the following day, September 20. On September 20, however, there was filed on behalf of the defendant a motion for postponement of the trial at least for a period of one week. This motion was supported by an affidavit of Frank B. Reid to the effect that, from his meager knowledge of this very complicated case, it was absolutely impossible for him to decide at that time whether or not in justice to defendant, a defense of insanity or mental defectiveness should be interposed at said trial.

■ The continuance or postponement of the trial in a criminal case is also a matter for the discretion of the trial court and the action of the trial court will not be disturbed on appeal, except for a manifest abuse of discretion prejudicial to the defendant: *State v. Hale,* 141 Or. 332, 18 P. (2d) 219; *State v. Luper,* 49 Or. 605, 91 P. 444.

The defendant was already represented by very able counsel before the appointment of Mr. Reid and they had had an opportunity to become fully conversant with the circumstances and facts of the case.

■ It is not an abuse of discretion to refuse to grant a continuance to enable the defendant to procure the services of additional counsel when the defendant has had sufficient earlier opportunity to do so: *Miller v. Commonwealth,* 270 Ky. 378, 109 S. W. (2d) 841; *People v. Milne,* 253 App. Div. 768, 1 N. Y. S. (2d) 1; *Thompson v. State,* 51 Ga. App. 5, 179 S. E. 200; *State v. Wilson,* 139 Wash. 191, 246 P. 289; *State v. Hillman,* 200 Iowa 320, 204 N. E. 248.

■ As stated, the defendant was represented by able counsel at the trial and his rights were all protected. There is no error in failure to grant a continuance where the defendant is adequately represented and defended by counsel during the trial: *State v. Haynes,* 120 Or. 573, 253 P. 7; *Owen v. Commonwealth,* 181 Ky. 257, 204 S. W. 162; *State v. Comer,* 176 Wash. 257, 28 P. (2d) 1027; *People v. Ralph,* 67 Cal. App. 270, 227 P. 642. The defendant has no constitutional right to be represented by counsel of his own selection when otherwise adequately represented: *State v. Butchek,* 121 Or. 141, 253 P. 367, 254 P. 805; *Howard v. Commonwealth,* 240 Ky. 307, 42 S. W. (2d) 335; *State v. Crump,* (Mo.) 274 S. W. 62; *Owen v. Commonwealth,* supra.

■ There is no error in denying the motion for continuance unless there is abuse of discretion. This court, in *State v. Hale,* supra, clearly announced this principle in the following language:

"The postponement of a criminal trial rests in the sound legal discretion of the court and 'all affidavits or papers read on either side * * * must be first filed with the court': Oregon Code 1930, § 13-905. It has been held in an unbroken line of decisions that in matters within the discretion of the trial court, this court will not disturb the action of the trial court except for a manifest abuse of such discretion, prejudicial to defendant."

The defendant was apprehended and taken into custody on the morning of July 18, 1938, about an hour after the shooting occurred. On that day the defendant was given permission to telephone to W. A. Carter, an attorney of Portland, Oregon, for the purpose of obtaining Mr. Carter as counsel, and shortly thereafter Mr. Carter telephoned L. G. English, the district attorney

for Lincoln county, and advised Mr. English that he might represent the defendant, but would inform either Mr. English or the defendant definitely in that regard within a few days. A few days after July 18, 1938, and before July 23, 1938, Mowry & Mowry, attorneys of Portland, Oregon, were retained by the defendant's family to represent him. So far as appears, no word was received from W. A. Carter and he did not take any steps to represent defendant. Messrs. Mowry & Mowry immediately became active in representing the defendant's interests. They appeared at the preliminary hearing before the magistrate on July 23, 1938. They appeared and represented the defendant at the hearing on the defendant's application for a preliminary hearing on the question of present insanity on July 29, 1938, and also at the arraignment on August 4, 1938. Defendant was present at that time and the court set the case for trial for September 14, 1938. On September 1, 1938, the court postponed the date of trial and reset it for September 19, 1938. The defendant communicated at various times with his attorneys, Messrs. Mowry & Mowry. His mother visited him at the jail on numerous occasions, and no effort of any kind was made to prevent him from freely communicating with anyone or making any efforts to hire further counsel, if he had desired them.

On September 19, 1938, at 10 o'clock a. m., when the state, represented by Mr. English, the district attorney, and Mr. Oscar Hayter, special counsel, appeared, ready for trial with some 40 witnesses, and when Messrs. Mowry & Mowry also appeared ready for trial, as attorneys for defendant, the defendant made a statement to the court to the effect that he was not ready for trial for the reason that he had been unable to

procure attorneys of his own selection to represent him, and that he had not been permitted to communicate with anyone. Defendant admitted that he did not rely on Mr. Carter to defend him, whereupon the court continued the trial until the following morning and permitted defendant to call Frank B. Reid, an attorney of Eugene, Oregon, and on the following morning the court made the ruling upon which error is here predicated. Messrs. Frank B. Reid and Mowry & Mowry, as attorneys for defendant, then moved for a continuation of the case on the ground that Mr. Reid had had no opportunity to prepare the case for trial and familiarize himself with the facts.

It seems that there could be no ground for complaint under the circumstances. Defendant was given every reasonable opportunity to arrange for such defense as he saw fit. He knew the date set for trial over a month in advance. He knew Mr. Carter would not represent him, and he had free opportunity to make arrangements for counsel other than Messrs. Mowry & Mowry, if he had not been satisfied with them as his attorneys.

In *People v. Milne*, supra, the defendant had been represented for more than three months by one attorney. On the eve of trial he retained another attorney who could not be present on the date of trial because of a previous engagement. It was held that there was no abuse of discretion in failing to postpone the trial so that defendant could be represented by a second attorney.

In *Miller v. Commonwealth*, supra, the defendant was at large on bond, charged with a crime committed 28 months before the date of the trial. The court held

that defendant was not entitled to a continuance to enable counsel employed the evening before the case was called for trial to prepare a defense, where no excuse was shown for failing to make arrangements sooner. See also *Thompson v. State,* supra; *State v. Hillman,* supra. In *State v. Wilson,* supra, the defendant had been represented by counsel, who withdrew a few days before the trial. The continuance was requested on the ground that new counsel might have time to prepare a defense. The court held that there was no abuse of discretion in refusing to grant a continuance when it appeared that counsel could have been employed several days sooner.

■ If it appears that defendant is adequately represented by counsel at the trial, there is no abuse of discretion in failing to grant a continuance. See *State v. Haynes,* supra. In that case the attorney for defendant withdrew on the morning of the trial. The court allowed the defendant until 1 o'clock of the same day to procure other counsel and prepare the defense. The court held there was no error in failing to grant a continuance since it appeared that defendant had been fully and ably represented at the trial.

At the trial of this case in September, 1938, Dr. Robert P. Smith, testifying as a witness in behalf of defendant, in the defendant's case in chief, after stating his qualifications as an alienist and psychiatrist, and after testifying as to his personal observation and examination of defendant, then testified that the defendant, at the time he shot and killed the deceased, Richard C. Earl, was insane and incapable of distinguishing between right and wrong in reference to this act of shooting and killing the said Richard C. Earl.

The defendant assigns that the court erred on the direct examination of Dr. Henry H. Dixon, a witness for the state, in overruling the objection of defendant to the following question: "Q. What is your opinion, Doctor?" It is contended by the defense that the introduction of evidence against a defendant, consisting of testimony based upon a compulsory or coercive examination of defendant, conducted over the protests of defendant and in the absence and without the consent of any of the counsel representing defendant, but, instead, over the known objections of such counsel, is a violation of the defendant's legal and constitutional rights, citing Art. I, § 12, Oregon Constitution.

There is no constitutional right against self-incrimination of the defendant involved in an examination of defendant for insanity where defendant consents to be examined: *State v. Spangler*, 92 Wash. 636, 159 P. 810; *State v. White*, 113 Wash. 416, 194 P. 390; *People v. Furlong*, 187 N. Y. 198, 79 N. E. 978; *State v. Petty*, 32 Nev. 384, 108 P. 934, Ann. Cas. 1912 D, 223; *People v. Strong*, 114 Cal. App. 522, 300 P. 84. No constitutional right of defendant is violated, although defendant is examined for insanity against his will: *State v. Coleman*, 96 W. Va. 544, 123 S. E. 580.

The error assigned here is on the sole ground that defendant, in being examined by an expert medical witness as to his insanity without the permission and consent of his attorneys, was caused to testify against himself within the prohibition of section 12 of Art. I of the Constitution of Oregon. The only evidence as to lack of consent on the part of defendant was found in the testimony of Dr. Henry H. Dixon, the expert witness who conducted the examination. This testimony shows

that the only thing which could be construed as objection on defendant's part to permitting an examination was his statement to the doctor that his attorneys had instructed him not to talk to anyone without his attorneys being present. Nevertheless the defendant, without any inducement on the part of the doctor, voluntarily talked freely with the doctor and permitted himself to be examined. Certainly, there was no refusal on the part of defendant to be examined. No coercion, either by the exercise of a position of authority, or otherwise, and no force or trickery of any kind were used.

A reference to the authorities which have decided this question shows that under the circumstances no constitutional right of the defendant against self-incrimination was violated. In *State v. Spangler*, supra, error was asserted in admitting the testimony on the question of insanity of an expert witness who examined the witness under the following circumstances:

"* * * This witness examined the appellant while he was in jail awaiting trial, with the knowledge of the sheriff and at the request of the prosecuting attorney, but without the knowledge or consent of the appellant's attorneys. The evidence does not show the nature or extent of the examination. Neither does it show that the defendant was unwilling that the examination take place."

The court held that no error was committed in admitting this testimony.

In *State v. White*, supra, error was assigned on the action of the court in permitting testimony of two expert witnesses on the question of insanity. The court held that no error was committed and that no provision of the state constitution against self-incrimination was

violated. The circumstances of the examination were as follows:

"The examination took place the day the trial opened. It was at the request of the prosecuting attorney, and without the knowledge or consent, so far as the record shows, of the attorney for the appellant. The doctors in testifying based their opinion, not only upon the physical examination, but upon answers to questions which had been asked of the appellant, and which he had answered. The appellant did not object to the examination or to the answering of the questions which were propounded to him. There is nothing in the record to show that he was unwilling either to answer questions, or that the examination take place."

In *People v. Furlong,* supra, the expert witness on the question of insanity examined the defendant at the request of the court, and neither the counsel for defendant nor counsel for the state was notified. The court held that there was no entrapment of defendant and that the doctors' testimony was not within the constitutional prohibition against compelling a defendant to give evidence against himself.

In *People v. Strong,* supra, it was asserted that the California statute was unconstitutional as compelling the defendant to testify against himself. In upholding the statute, the court said:

"* * * Nothing in the section compels him to submit to an examination. If he does so the action is purely voluntary. To assert his constitutional rights all that is required is for him to stand mute, and possibly, also, to refuse to permit the examination, when the appointed expert undertakes to proceed; and whether he does so or not there is no compulsion."

From the facts as already discussed, it is clear that there was no compulsion of any kind upon defendant

and that the defendant voluntarily consented to the examination. Nevertheless, it is held that no constitutional right of the defendant is violated even if the examination is against the will and without the consent of the defendant.

In *State v. Coleman,* supra, the court held that where the defense of mental irresponsibility is raised, evidence of facts disclosed by a mental examination of the defendant by experts, whether before or during the trial and with or without the defendant's consent, did not violate the constitutional privilege of defendant not to be a witness against himself.

In making the contention that defendant's rights were violated because the examination was not made with his attorney's consent, the defendant's attorneys do not claim that they would not have consented to the examination. In view of other evidence, it might seem that if the point had been raised at the time of the examination there would have been consent.

It is assigned that the court erred in receiving in evidence State's Exhibit O, which was a photograph of a portion of the nude shoulder and nude back of the deceased, taken after death, showing a bullet wound in the deceased's back. It is urged that the bullet wound shown by said photograph had already been clearly and fully described and explained under oath by an eminent pathologist and had already been further illustrated, described and explained before said jury through the introduction in evidence of diagrams, plates or physiological charts, and there was therefore not the slightest necessity for the introduction of said photograph in evidence.

■■■■ Although a photograph might be prejudicial because of its so-called gruesome character, it is never-

theless admissible in evidence if material to some issue in the case: *State v. Weston,* 155 Or. 556, 64 P. (2d) 536, 108 A. L. R. 1402; *State v. Weitzel,* 157 Or. 334, 69 P. (2d) 958; 2 Wigmore on Evidence, § 1157; *Commonwealth v. Retkovitz,* 222 Mass. 245, 110 N. E. 293; *State v. Gaines,* 144 Wash. 446, 258 P. 508. A photograph of a dead body is properly admitted when it is material for the sole purpose of explaining and demonstrating the testimony of expert medical witnesses: *State v. Weston,* supra; *State v. Clark,* 99 Or. 629, 196 P. 360; *Commonwealth v. Winter,* 289 Pa. 284, 137 A. 261; *Carnine v. Tibbetts,* 158 Or. 21, 79 P. (2d) 974. The photograph described in State's Exhibit O is not gruesome or prejudicial: *State v. Weston,* supra; *State v. Clark,* supra. *State v. Miller,* 43 Or. 325, 74 P. 658, cited by defendant, has been distinguished and is not in harmony with *State v. Weston,* supra. See also *State v. Finch,* 54 Or. 482, 103 P. 505, and *State v. Clark,* supra, where the case of *State v. Miller,* supra, is distinguished.

■ The arguments which defendant presents to the effect that State's Exhibit O was improperly admitted because it was a gruesome photograph, find answer in *State v. Weston,* supra. In that case the court, speaking by Mr. Justice ROSSMAN, gave a very complete analysis of the law applicable to so-called "gruesome" exhibits. The opinion and authorities there set forth, it is believed, constitute a clear showing that the court committed no error in the present case in admitting in evidence State's Exhibit O. The defendant's argument rests entirely upon the assumption that error was committed, unless State's Exhibit O was necessary to prove some point in the case, and that since the fact proved by that exhibit was proved by the testimony of expert wit-

nesses, it was unnecessary. The answer to this contention is that such is not the law, as established in this state, not only by *State v. Weston,* supra, but also by other decisions. The rule of law is that exhibits of this character, sometimes known as real evidence, are admissible if they are material as evidence. In *State v. Weston* the court enters into a discussion of this particular question. At page 575, the court quotes from 2 Wigmore on Evidence, § 1157, to the effect that evidence of this kind should be admitted if material, whether or not there is possible ground for prejudice due to the gruesome character of the exhibit. At pages 575 to 578, the court cites a number of cases involving the propriety of the admission in evidence of photographs of dead bodies. In all of those cases it was held that no error was committed in admitting such photographs where the exhibits were material in the proof of some part of the state's case. The rule is well summarized in a quotation from *Commonwealth v. Retkovitz,* supra, where the court said: " 'Competent and material evidence is not to be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible.' " See also *State v. Gaines,* supra, and *State v. Weitzel,* supra, where the court held, without comment, that a photograph was properly admissible in a case of assault with intent to commit rape, the photograph showing the condition of the prosecutrix the morning after the assault.

State's Exhibit O was material in the present case to prove the exact nature and manner in which death was caused to the deceased by the bullet wound inflicted by defendant. It was material for the purpose in exactly the same way that the testimony of the phy-

sicians who performed the autopsy was admissible. As the review of the evidence in defendant's brief shows, it was material for the further purpose of bearing upon the question of defendant's asserted self-defense. This exhibit is a photograph showing a bullet wound in the back of the deceased. It is self-evident that a shot in the back is almost utterly inconsistent with self-defense. There is no doubt that the photograph is clearer and more understandable evidence than oral testimony. That it was cumulative does not affect its materiality. Beyond this, defendant's contention that he did not deny that one of the bullets went in the back, does not alter the question. He contended he was acting in self-defense. All possible evidence indicating that he shot the deceased in the back is important to prove the impossibility of his claim. It has been held in a number of cases that photographs of dead bodies and other gruesome exhibits are admissible and material simply for the purpose of demonstrating the testimony of expert witnesses.

The exhibit involved in *State v. Weston*, supra, was a plaster cast of the arm of the deceased, showing numerous shots inflicted by a shotgun. The court held that the cast was admissible for the purpose of illustration, and used the following language: "As Dean Wigmore states in a citation which we have already given, the cast was 'a superior substitute for words.' Its use must have conveyed to the jury a better understanding of the evidence than mere words could have afforded."

In *Commonwealth v. Winter*, supra, the photographs involved were of two deceased children taken to a morgue. The court held that the photographs were proper since they were used by the doctor who per-

formed the autopsies to explain the wounds. In *State v. Clark,* supra, a photograph was held properly admissible showing the locality in which the body was found, including a picture of the body of the deceased before it had been moved. The court held that this photograph was admissible for the same reason that any map of the locality would have been admissible.

In *Carnine v. Tibbets,* supra, *State v. Weston,* supra, was cited with approval in a civil personal injury case in support of the proposition that it was not error to admit in evidence a human skeleton for the purpose of illustrating the testimony of the plaintiff's expert witness, a chiropractor.

Insofar as the admissibility of the exhibit rests upon the discretion of the court, depending upon the relative gruesomeness of the exhibits and consequent possible prejudice, it is clear that State's Exhibit O is not of such a character as would excite any undue prejudice. A survey of the photograph itself will disclose that it is nothing more than a picture of a part of a bare human back on which is a black spot identified as the bullet wound. The head and face are not shown. There is no blood in the picture. There is nothing of a gruesome character whatsoever.

In *State v. Weston,* supra, it was held that there was nothing gruesome or prejudicial in the case there involved for the same reasons as presented here. In *State v. Clark,* supra, it was held that there was nothing gruesome or calculated to excite the passions of the jury. The court there stated: ''The deceased was shown lying as a tired man might have lain.''

After a careful consideration, we are thoroughly satisfied that there was no error committed in the trial

of this case. There was no exception taken to any part of the charge to the jury, and we think the trial was conducted in a very careful and judicious manner and that the defendant had a fair and impartial trial.

Finding no error in the record, the judgment of the circuit court is affirmed.

KELLY, J., not sitting.